ROCKS, ET UX. *v.* BROSIUS, ET AL.

[No. 73, September Term, 1965.]

*Decided March 9, 1966.*

The cause was argued before PRESCOTT, C. J., and HORNEY, MARBURY, BARNES and McWILLIAMS, JJ.

*John D. Gilmore, Jr.,* with whom were *Leo William Dunn, Jr.* and *William V. Meyers* on the brief, for appellants.

*J. Nicholas Shriver, Jr.,* with whom were *Cross, Shriver, Bright & Washburne* and *Hal C. B. Clagett* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

This appeal arises from a final decree passed on February 11, 1965 by Judge Bowie in the Circuit Court for Prince George's County granting specific performance, of, as well as declaratory and other relief in connection with, an agreement to lease, dated August 4, 1962 involving a tract of land containing 94.5036 acres lying to the north and south of Contee Road in Prince George's County, known as "Briarwood." Also involved is an order passed by Judge Bowie on January 11, 1965 holding the appellants in contempt of an interlocutory injunction dated and filed in this case on May 14, 1964.

"Briarwood," the 94.5036 acre tract involved in this case was owned in fee simple by John W. Staggers and Ruth E. Staggers his wife (Staggers), on February 5, 1962. On that day

the Staggers executed a lease of "Briarwood" to Prince-Mar Builders, Inc. (Prince-Mar), a Maryland corporation of which Ralph D. Rocks, one of the appellants, was president. By this lease, Prince-Mar held the leasehold interest in the land for 35 years "renewable from term to term, as hereinafter set forth, in perpetuity, from the 1st day of March, 1962 * * *." The rent received was $17,010.65 a year payable in even and equal *monthly* installments accounting from March 1, 1962 over all discounts for taxes, assessments of every kind, and other public charges levied or assessed against the demised premises, all of which charges Prince-Mar, as lessee, covenanted to pay. There was a provision that if the rent was in arrears at any time and the default continued following 10 days written notice, the lessors could make distress for the rent, if in default for 60 days following written notice, the lessors could reenter and hold the demised premises and if in default for 6 months following 60 days written notice of the arrearage of rent, the lessors could reenter and hold the demised premises as if the lease had not been made. There was a specific covenant that the lessee, its successors or assigns would "pay the aforesaid rent, taxes and assessments *when legally demandable*" (emphasis supplied). The lease also provided that during the original 35 year period, the lessee could by paying a renewal fine of $1.00 request a new lease for another 35 year term for the annual rental of $17,010.65 "adjusted upwards in the same proportions as the 'Consumer's Price Index for all Items for Moderate Income Families in Large Cities', as determined by the United States Department of Labor, Bureau of Labor Statistics, (or, if there be no such Consumer Price Index, then by the successor or the most nearly comparable successor index thereto), for the month of December next preceding the date on which the Lessee desires to renew said term has increased from such Consumer Price Index for December, 1961 and upon the same covenants and conditions as herein set forth, so that the demise hereby created may be renewable and renewed from time to time, forever." There was a covenant that if during the original 35 year term, the lessee would pay the sum of $3900 an acre with all accrued rent to the lessors, then the demised property would be discharged from the payment of rent and the lessors

would convey the demised property to the lessee, its successors and assigns by a special warranty deed for a good and merchantable title in fee simple. After the expiration of the original 35 year period, there was a similar right of redemption for $3900 an acre adjusted upwards by the Consumer's Price Index formula already mentioned.

The lease further provided that the lessors, their heirs and assigns, would subordinate their interest to bona fide mortgages or deeds of trust obtained from recognized lending institutions "for the purpose of financing constructive and permanent financing, or refinancing of improvements erected or to be erected on the demised premises" by the lessee its successors and assigns and that the failure of the lessee, its successors or assigns, to make payments under such mortgages or deeds of trust "shall constitute a default under the terms of this lease" and the lessees, their heirs and assigns, at their option might (a) terminate the lease and repossess the property or (b) make the payments and charge them with interest at 6% per annum as additional rent immediately due and payable without notice.

By paragraph 10 of the lease, the lessors, for themselves, their heirs and assigns, covenanted with the lessee, its successors or assigns, "that at the request of the Lessee its successors or assigns, they shall join with it in executing, acknowledging and delivering any and all documents required to effect any subdivision of the subject property, or any part thereof, into smaller parcels, including the dedication of the public streets and rights of way and easements for public utilities required by such subdivision, * * *."

In paragraph 11 of the lease there was a covenant that the lessors, their heirs and assigns, upon any subdivision into smaller parcels as the lessee, its successors or assigns, may desire, would enter into separate leases, completely independent of the leases on the remaining properties, containing the same covenants and pro rated rent. Paragraph 11 then continued: "The Lessors, their heirs or assigns, shall join in such lease instruments as may be prepared by the attorneys for the Lessee, its successors or assigns, to effect a separate leasing of the smaller parcel or parcels * * *." The recording charges for the cost of preparing the new leases were to be borne by the lessee.

Attached as an exhibit was a metes and bounds description of Briarwood. The description is divided into three parts, 1) Parcel A containing 35.0261 acres, 2) Parcels B and C containing 34.2981 acres, and 3) Parcel D containing 25.1794 acres. The total acreage described is 94.5036 acres. This lease was duly recorded among the land records of Prince George's County.

Prince-Mar on March 23, 1962 entered into a written, but unrecorded, agreement to lease Briarwood to J. William Brosius or assigns. Mr. Brosius, a builder of homes, gave his promissory note dated April 10, 1962 for $5000.00 payable to Prince-Mar or assigns within 60 days from date as a payment on account of the agreement to lease.

Prince-Mar, on April 25, 1962, by a deed duly recorded, conveyed its leasehold interest in "Briarwood" to the appellants Ralph D. Rocks and Jean W. Rocks, his wife (the Rocks or the appellants), as tenants by the entireties for the residue of the term of years yet to come, with the rights of renewal forever, subject to the payment of the annual rent received of $17,010.65 payable monthly in accordance with the lease of February 5, 1962.

On May 9, 1962, A. James O'Mara, a registered engineer, of the engineering firm of Greenhorne & O'Mara, Riverdale, Maryland, prepared a plan of Section One of Briarwood. His certificate indicates the source of title of Mr. and Mrs. Staggers and that the total area in Section One (I)[1] consists of 20.3945 acres. This area is divided into 52 lots. In the "Owners' Dedication" signed by Mr. and Mrs. Staggers, as owners, and by the Rocks, as lessees, there is indicated their adoption of the plan of subdivision and the establishment of the building restriction lines, the drainage easements and the dedication of the streets to public use. There is also a recitation that "There are no suits of [or] action, leases, liens or trusts on the property included in this plan of subdivision, except a certain lease and the parties

---

1. The Subdivision Plat spells out the numeral, but plaintiffs' Exhibit 1—a sketch showing the entire area divided into sections uses the Roman numerals. The Roman numeral will be placed in parentheses following the spelled-out numeral, as the decree uses the Roman numerals in describing the various sections.

in interest thereto have indicated their assent." The plan for Section One (I) was approved by the Maryland-National Capital Park and Planning Commission (Planning Commission) and the Prince George's County Planning Board (Planning Board) on May 23, 1962 and was duly recorded thereafter.

On June 14, 1962, Mr. O'Mara certified a second plat for Section Two (II) of Briarwood containing 14.2915 acres divided into 39 lots. An identical "Owners' Dedication" was signed by Mr. and Mrs. Staggers and the Rocks on June 12, 1962. The plat for Section Two (II) was approved by the Planning Commission and the Planning Board on June 20, 1962 and was duly recorded thereafter.

The total number of lots in Sections One (I), and Two (II) was 91. A Modification Agreement, dated July 11, 1962, and duly recorded, was entered into between Staggers and the Rocks whereby the 91 lots were severally leased in accordance with the terms of the original lease.

On August 4, 1962, the Rocks as "Lessors" entered into an agreement with J. William Brosius and Louis J. Brosius (Brosius), as "Lessees" in regard to the entire 94.5036 acres of Briarwood. The agreement which was signed, sealed and acknowledged by all of the parties recited that the Rocks planned to subdivide the 94.5036 acres into approximately 255 lots and Brosius desired to lease each and all of the lots which the Rocks were willing to lease to Brosius upon the terms set forth. The agreement further recited that Brosius had deposited with the Rocks on March 23, 1962 the sum of $5000.00 "as an earnest money deposit to be held by the Lessors in pursuance of this agreement."

Paragraphs 2 and 3 of the agreement provided as follows:
"2. The Lessors agree to prepare and cause to be recorded among the Land Records for Prince George's County, Maryland, a Plat, or Plats, of subdivision subdividing the said 94.5036 acre parcel of land into approximately 255 lots as herein above mentioned, 34.-6860 acres thereof having been heretofore subdivided into 91 lots in accordance with plats of subdivision duly recorded among Land Records in Plat Book WWW-44, Plats No. 21 and 47.

"3. Upon the recording of said plats the Lessors and the Lessees shall as and when each separate plat is recorded make and enter into a sub-lease agreement in the *exact form of the sub-lease agreement* made on even date herewith *applicable to the 91 lots* included in the plats heretofore recorded among the Land Records as aforesaid, the terms and conditions of each said sub-lease to be exactly those contained in the said agreement executed on even date herewith except for the property description." (Emphasis supplied).

The agreement further provided that the Rocks would pay to Brosius one-half of the contribution required by the Washington Suburban Sanitary Commission in connection with the engineering for and installation of, the outfall sanitary sewer to service the lots into which the 94.5036 acres were to be subdivided, with certain exclusions; the Rocks agreed to cooperate with Brosius to effect a consolidation of any sub-lease created during the construction of residential dwelling houses and ground rent leases so that the Staggers would own a proportionate portion of the leases without any agreement to subject the interest therein to the lien of any mortgage and the Rocks and Brosius would own a proportion thereof; it was agreed that any sub-leases created by Brosius would contain a provision for redemption based on a capitalization of all rents of 6%; it was also agreed that the earnest money of $5000.00 would be applied ratably to the first rent, or rents, due for each of the lots into which the 94.5036 acres would be divided; Brosius would pay the cost of recording the sub-leases; and, it was agreed that the unrecorded prior agreement of March 23, 1962 was cancelled.

The earnest money of $5000.00 referred to in the agreement as having been deposited was the promissory note of April 10, 1962 payable to Prince-Mar which was payable 60 days from its date. Actually it was not paid until October 16, 1962 by a check to the Rocks at which time the Rocks returned the note marked "Paid in full, Thos. G. Martin, Secretary."

By a Supplemental Agreement, dated August 6, 1962, (signed, sealed and acknowledged by the Rocks), the Rocks agreed with Brosius to subordinate their leasehold interest in the 94.5036

acres to any first mortgage or first deed of trust "securing an interim bona fide development loan on each group of lots, the proceeds of which loan * * * are to be used for the improvement of the lots * * *." The subordination agreement further provided that the term of any such loan should not exceed 18 months and should be made by a responsible lending institution. There would be no personal liability on the loans by the Rocks, who would execute instruments required by the closing attorneys to subordinate their interest, and a default by Brosius in the repayment of any such loan "shall constitute a default by the Lessees under each and all of the subleases by reason of which the Lessors shall have the right to reenter the premises and terminate each and all of said subleases." It was also provided that the subordination agreement bound the Rocks, "their heirs, administrators, and assigns and shall be deemed to run with and bind their interest in the 94.5036 acre parcel of land and the lots into which the same are subdivided in accordance with said agreement to lease." As already indicated the subordination agreement was executed only by the Rocks.

On August 23, 1962, the Rocks, as lessors and Brosius, as lessees executed a Sub-lease and Deed of Assignment, recorded on October 3, 1962, which subleased the 91 lots in Sections One (I) and Two (II) already recorded for the "rest and residue, save one day, of the term of years yet to come and unexpired in the 35 year term under the Original Lease." Brosius was to pay a subrent of $132.00 for each lot annually accounting from April 1, 1963 and thereafter the subrents were payable semiannually at $66.00 for each lot. Brosius had the right to redeem each lot for $2200.00 plus accrued rent to the date of redemption. The sublease provided that if one or more of the rents were in arrears the Rocks could make distress; if the arrears continued for 60 days, the Rocks could reenter and hold the premises until the arrearages were paid; and, if the arrears continued for 6 months the Rocks could reenter and hold the premises as if the sub-lease had never been made. Brosius agreed to pay "the aforesaid rents, taxes and assessments when legally demandable."

There was also a provision after the expiration of the original term for payment of rent with upward adjustment based

on the "Consumer's Price Index for all Items for Moderate Income Families in Large Cities", at the time of renewal in proportion to the Index in December 1961, and a similar provision for upward adjustment after the original term for the $2200.00 redemption price. The Rocks covenanted to pay the Staggers $68.60 annually in equal monthly installments for each lot and represented that the lots could be redeemed under the original lease for $1486.54 plus accrued rent, subject to the same type of adjustment based on the Consumer's Index. The Rocks also agreed that during the term, they would subordinate their interest in the leased property to any interim construction loan obtained from a responsible lending institution for the purpose of erecting improvements on the property if the construction loan did not exceed 75% of the appraised value of the completed improvements as appraised by the lending institutions, and if the term of the loan did not exceed 18 months.

A question arose as to whether the payment of rent was to be made on all 255 lots on all of the 94.5036 acres or only upon those lots in the subleases as and when executed. In the spring of 1963, by an exchange of correspondence, the Rocks and Brosius construed the agreement to lease as requiring the payment of rent for all 255 lots, accounting from October 1, 1962, and the rent was paid by Brosius on April 20, 1963 or 20 days after the due date of April 1, 1963.

The engineer's certificate on the plat for Section Three (III) was dated September 25, 1962. On this plat the Owners' Dedication, signed by the Staggers and the Rocks was dated September 26, 1962. The plat was approved by the Planning Commission and the Planning Board on October 17, 1962. It was recorded prior to the filing of suit. Section Three (III) showed a subdivision of 3 lots and a triangular outlet marked "A".

The relations between the Rocks and Brosius remained pleasant until at least October 3, 1963 when the attorney for the Rocks wrote Brosius as follows:

"I believe we have worked out our problems with Mr. Staggers and as a step toward documenting the leasing of the additional lots to be subdivided I would suggest that we proceed with preparation of the plat of the property, which should be recorded prior to

my making a lease agreement between Mr. and Mrs. Rocks and you and making the necessary modification to the Staggers lease agreement so that the lots will be leased on an individual basis.

"You will recall that we had an agreement with Mr. Staggers to the effect that we would either screen plant a lot for a distance of 50 feet opposite the new entrance way to his property or in the alternative give him one of the lots in the tier of lots lying adjacent to Contee Road so that he could control the appearance of the entrance way across from his property.

"If you are now ready to proceed with the development of the lots lying on the south side of Contee Road, I think we should proceed with the recording of the subdivision plat. If the above meets with your approval, I will appreciate your instructing Greenhorne & O'Mara to proceed accordingly so that the various documents can be prepared and executed."

The trial court found that "at some point after October 3, 1963 and by November 1, 1963, or within a matter of 28 days, the Rocks had a complete change of mind, and it is fair to conclude that this must have had some connection with a change in the general construction picture, wherein the land must have been recognized by the Rocks as being far more valuable than the $2200.00 per lot figure placed upon the lots by the terms of the sublease."

In any event, on November 1, 1963, the rent for October 1, 1963 in the amount of $16,830.00 not having been paid, counsel for the Rocks wrote Brosius notifying them of their election to reenter the premises and of the termination of the lease agreement for failure to pay the rent past due. Also on November 1 Brosius had forwarded a check for $8000.00 currently dated and one dated November 8 for $8830.00. The two letters crossed in the mail. Mr. Rocks returned the checks in a letter dated November 4. Brosius on November 8 mailed a certified check for $16,830.00 for the October 1, 1963 rent, but this was returned by Mr. Rocks in a letter of November 15 in which Mr. Rocks contended that he "was reliably informed that there are existing defaults in the terms and conditions of

the several deeds of trust." This certified check and a statement dated November 20, 1963 from the Loyola Federal Savings and Loan Association (Loyola Federal), the lending institution making the construction loans, that the Brosius' accounts "are current" were forwarded to counsel for the Rocks. Counsel for the Rocks returned the certified check in his letter of November 25 and on December 4 counsel for Brosius wrote counsel for the Rocks indicating that the actions of the Rocks were a breach of the various agreements and subleases and that court action would have to be initiated. The letter continued as follows:

"The plats for Sections IV and V of Briarwood have been in your hands for a number of weeks. It is apparently your intention not to execute these and thereby prevent recordation. We hereby formally demand that these plats, now in your possession, prepared by Greenhorne and O'Mara for Sections IV and V of Briarwood be executed by the original Lessors (Staggers), by you as Lessors to the Messrs. Brosius and forwarded to them at their address in Frederick, Maryland for their execution preliminary to recordation. We further demand that you instruct Greenhorne and O'Mara to prepare plat plans in accordance with the agreement of August 4, 1962 for the balance of the 94.5036 acres in the Briarwood tract and that these additional plat plans be signed by both the Staggers and you and sent to the Brosius brothers for their execution. Finally, we demand that in accordance with paragraphs 2 and 3 of the agreement of August 4, 1962, you enter, as Lessors, into the enclosed sublease and deed of assignment which has been executed by the Messrs. Brosius, as Lessees.

"If we do not hear from you affirmatively by Monday, December 9, 1963, with regard to these demands, it will be necessary for us to follow the only remaining course of action open to us—that is initiating legal action."

Counsel for the Rocks then contended that there was a default for the failure to pay the 1964 taxes "when legally de-

mandable". The exhibits show that these taxes in the amount of $1667.63 were paid on December 31, 1963.

The present suit for specific performance, a declaratory judgment, damages for delay in performance, and for an interlocutory injunction, was filed on January 14, 1964. Also on that day, upon a petition of Brosius, the Circuit Court permitted the payment by Brosius of $6006.00 to the clerk for the rent due on lots occupied by Brosius.

After the Rocks filed their answer, the Circuit Court after hearing, issued an interlocutory injunction restraining the Rocks and Prince-Mar from the following:

> "1. Obstructing, interrupting or interfering in any way with the leasehold title of Plaintiffs or any one claiming by through or under Plaintiffs in and to the parcel of land described and referred to in a sub-lease and deed of assignment relating to 34.6860 acres of land in Prince George's County, Maryland dated August 23, 1962 and recorded among the land records of Prince George's County in Liber 2737 Folio 405, and upon any sale of an improved lot from said parcel of land Defendants shall promptly comply with the applicable terms of (a) an agreement to lease dated August 4, 1962 and recorded among the land records of Prince George's County in Liber 2737 Folio 399 and (b) the sub-lease and deed of assignment of August 23, 1962 first above referred to.

> "2. Making or executing, of record or otherwise, any encumbrance, or taking any other action, of record or otherwise, to affect conveyance in any manner of the title to any portion or all of the parcel of land containing the balance of the entire tract of 94.5036 acres which is the subject matter of and is described and referred to in the aforesaid August 4, 1962 agreement to lease which is recorded as aforesaid in Liber 2737 Folio 399 of the land records of Prince George's County except subject to and in complete acknowledgement of all of the rights of Plaintiff as set forth in said Agreement of August 4, 1962; * * *."

The injunction was effective upon posting a $1000 bond by Brosius and was subject to a hearing on an application for dissolution of the injunction upon 10 days notice to the Rocks and Prince-Mar. The facts in regard to the alleged violation of this injunction will be given later when that issue is considered.

At the hearing on the merits held January 28, 1965 the only testimony given was that of J. William Brosius, which is, of course, uncontradicted. The documents mentioned above, and others were offered in evidence. The Rocks offered certified copies of various deeds of trust in evidence.

In addition to the above facts, Mr. Brosius testified that Mr. Rocks told him on two occasions: "I am a wealthy man and I can carry this a whole lot further than you can. You can't afford to fight me, and I will carry it as far as necessary, and if we have to appeal it, we will appeal it. * * * [H]e said that he was going to carry this to the enth degree, he was a wealthy man, and that he would break me if necessary."

At the argument, after the Chancellor indicated that the three excuses advanced in defense of the Rocks were without merit, counsel for the Rocks argued for the first time that the agreement to lease of August 4, 1962 (prepared by counsel for the Rocks) was unenforceable by Brosius because of the indefiniteness of its terms. The Chancellor indicated that this defense was neither mentioned in the pleadings nor in the opening statement of counsel.

The bill of complaint was dismissed as to Prince-Mar.

In a comprehensive and well considered opinion, Judge Bowie concluded that there was no merit to any of the defenses advanced on behalf of the Rocks and that Brosius was entitled to relief. The Chancellor signed a decree on February 11, 1965 which provided that:

1. The Rocks perform without further delay their obligations under the Agreement to Lease dated August 4, 1962 by executing and recording the development plans already prepared by the engineers for Sections IV and V of Briarwood and in the possession of the Rocks.

2. The Rocks execute and file for record the development plan for Section VI of Briarwood to be in substance in the

form presented to the court at the contempt hearing on November 23, 1964.

3. As the plats for Sections IV, V and VI were recorded, the Rocks will execute appropriate subleases exactly like the sublease of Sections I and II dated August 23, 1962, except as to the description, so that all of the 94.5036 acres of Briarwood would be ultimately fully platted and recorded.

4. The matter of damages for (a) the contempt previously adjudged, and (b) for the wrongful eviction from all of Briarwood be deferred for later determination.

5. The Rocks execute any necessary other instruments and documents required to effectuate the Agreement to Lease, including subordination agreements and documents required by the Sanitary Commission or the Department of Public Works.

6. The Rocks comply with the Agreement to Lease and the sublease of August 23, 1964 by executing deeds when required at the time of settlement or when redemption of lots are made.

7. There be an accounting as to the money paid into court.

8. The provisions of the Agreement to Lease are clear, definite and enforceable.

9. The bond for the Interlocutory Injunction is discharged.

10. The Rocks will pay the costs.

The Rocks, on February 23, 1965, filed an order entering an appeal to this Court "from the decree entered in the above entitled action on February 11, 1965."

The Rocks stated in their brief: "No appeal is taken from the decree as it applies to the 91 lots of land sub-let by the Appellants dated August 23, 1962."

The questions presented for our decision are:

I. Have the Rocks by abandoning their appeal to Section One (I) and Two (II) of Briarwood, foreclosed this appeal as to the rest of Briarwood?

II. Was the Agreement to Lease of August 4, 1962 specifically enforceable?

III. Were the attempted reentry and termination of the lease by the Rocks justified (a) by the failure of Brosius to pay rent in time? (b) by the alleged default in accounts at Loyola Federal? or (c) by the failure to pay real estate taxes prior to December 31, 1963?

IV. Did the Chancellor err in denying the Rocks discovery of documents and other data in regard to Brosius' financial condition?

V. Was the ruling of the Chancellor on contempt appealable, and if so, did the Chancellor err in holding the Rocks in contempt?

VI. Is Brosius entitled to damages in addition to specific performance and declaratory relief?

## I.

In the appellants' brief, the Rocks stated: "No appeal is taken from the decree as it applies to the 91 lots of land sub-let by the Appellants by agreement dated August 23, 1962." The appellees earnestly contend that this is the abandonment of the appeal so far as Sections One (I) and Two (II) are concerned and, inasmuch as the obligation of the Rocks by the agreement of August 4, 1962 is an entire one for a plat or plats subdividing the entire 94.5036 acres into approximately 255 lots, of which 34.6860 acres were already subdivided by the plats for Sections One (I) and Two (II), there is a recognition of, and acquiescence in, the validity of the decree resulting in a waiver of the right to appeal from that decree.

The right to appeal may be lost by acquiescence in, or recognition of, the validity of the decision below from which the appeal is taken or by otherwise taking a position which is inconsistent with the right of appeal. See *Bowers v. Soper,* 148 Md. 695, 130 Atl. 330 (1925) involving an appellant who sought the distribution of funds in accordance with an audit and attempted to appeal from the order finally ratifying the auditor's report and account. See also *State, use of Shipley v. Walker,* 230 Md. 133, 186 A. 2d 472 (1962) and *Turner v. Washington Suburban Sanitary Commission,* 221 Md. 494, 158 A. 2d 125 (1960) in which we held that if a party accepted the amount of a remittitur, he could not on appeal challenge the order granting the remittitur. It is also well settled that an appeal will not lie from a consent decree. *Mercantile Trust Co. v. Schloss,* 165 Md. 18, 166 Atl. 599 (1933). It can be argued, however, that upon consideration of the whole contractual arrangement between the parties, and the signing and recorda-

tion of the plats for Sections One (I) and Two (II) there was a severable execution by the parties of an otherwise unenforceable contract and an *executed* part of that contract cannot be challenged by the parties even though the remaining portion of the contract may be successfully challenged by the Rocks. As we are of the opinion that the contract as a whole is specifically enforceable, we prefer to rest our decision on the merits and, therefore, do not find it necessary to decide this interesting point raised by Brosius in regard to the waiver or abandonment of the entire appeal so far as the enforceability of the agreement of August 4, 1962 is concerned.

## II.

The Rocks challenge the specific enforceability of the agreement of August 4, 1962 on two grounds: (a) that the property to be conveyed was "non-existent" at the time of the execution of the agreement, remained "non-existent" at the time of filing suit and the holders of the fee simple title were not parties to the suit, and (b) the agreement is too vague for specific enforcement in that neither the agreement nor extrinsic evidence indicates the manner in which the subdivision is to be carried out or the time within which the agreement is to be performed.

### (a)

The Rocks raise the point that the agreement of August 4, 1962 may not be specifically enforced because the property was "non-existent" for the first time on this appeal. The point was not referred to in the pleadings or in the argument in the trial court. Assuming, but not deciding—in view of Maryland Rule 885—that the point is properly before us, we are of the opinion that it is without merit. It seems clear to us that the Rocks obtained the leasehold estate in Briarwood by the Lease Agreement of February 5, 1962. This instrument was effective as a lease of the 94.5036 acres for a *definite term* of 35 years, renewable, as provided in the lease, forever. The rent received was $17,010.65 payable in monthly installments accounting from March 1, 1962. There were provisions for apportionment of the ground rent as well as the usual provisions for distress, reentry and forfeiture if the rent received was not paid. The Staggers also agreed to warrant the property and execute such further

assurances of the property as might be requisite. The instrument was duly recorded. This type of leasehold estate is well recognized in Maryland and has long been used in this State and in the Province of Maryland as a result of the provision in the Charter granted by King Charles I to Cecelius Calvert, Lord Baltimore, in creating the Province of Maryland, that the Statute of Quia Emptores [2] should not apply in the Province. For an interesting discussion by Judge Chesnut of the Maryland ground rent system, its creation and its various legal incidents, with a review of the Maryland cases, see *Jones v. Magruder,* 42 F. Supp. 193, 195-197 (1941). See also 38 C.J.S. *Ground Rents* §2, c(2), pages 1090-1091.

Both the Staggers and the Rocks acknowledged that the Rocks were the lessees of Briarwood. In all of the recorded subdivision plats, the Staggers signed as "owners" and the Rocks as "lessees." It is apparent that the Rocks had an estate in the land which *required* their "assent to the plan of subdivision" as the plats recite on their face.

There seems to be little question that the "property", i.e., the unencumbered leasehold estate of the Rocks, exists. The Rocks had the right to sublease the property and to agree to do this. In the agreement of August 4, 1962, the Rocks did agree to sublease to Brosius the entire 94.5036 acre parcel and to prepare and record plats of subdivision dividing the parcel into approximately 255 lots, reciting that plats of subdivision for 34.6860 into 91 lots had already been recorded and giving their recordation references. The sublease of August 23, 1962 was made pursuant to the agreement of August 4, 1962 and set out the amount of the subrents on the 91 lots already platted. Paragraph 3 of the agreement of August 4, 1962 provided that subleases for plats to be made and recorded for the remaining lots would have the same terms and conditions as contained in that sublease except for the property description. The agreement of August 4 and the sublease of August 23 are to be construed together and made clear and definite the terms of the contractual arrangement between the parties.

The correspondence between counsel for the Rocks and Bro-

---

2. Statute of Westminster III, 18 Edw. 1, C. 1 (1290 A.D.).

sius between July 20 and October 3, 1963 indicates that the Rocks understood that Brosius had legal rights in all of the lots. For example, in the letter of July 23, 1963 counsel for the Rocks stated, in part:

> "We have no question with respect to *our legal rights* in the matter as to the property lying south of Contee Road [3] and will, when and if necessary assert *our and your rights* positively but we believe to do so before we have concluded our negotiations [with the Staggers] might prove hurtful." (Emphasis supplied).

Even more importantly, Brosius paid the Rocks and the Rocks had demanded, rent on *all 255 lots* not only with respect to the original deposit of $5000.00 but also for the later rent payments made on April 20, 1963.

Then too, on October 3, 1963, counsel for the Rocks wrote Brosius that the problems with the Staggers had been worked out and if Brosius was ready to proceed with the development of the lots on the south side of Contee Road "I think we should proceed with the recording of the subdivision plat." He then requested Brosius to instruct Greenhorne and O'Mara to proceed accordingly "so that the various documents can be prepared and executed."

There were property interests existing in both the Rocks and Brosius and this was clearly acknowledged by the Rocks.

The Rocks rely on a possible alternative holding in *Ward v. Newbold,* 115 Md. 689, 694-695, 81 Atl. 793, 795 (1911). The *Newbold* case involved a contract of sale between the fee simple owner of land in Baltimore City and a purchaser in which payment was to be made in part by two ground rents to be created but in regard to which no *term* was stated. The contract also required the building of 2 two-story dwelling houses containing 6 rooms each, without stating the depth, size or character of the houses to be built. This Court held that the contract could not be specifically enforced because its terms were not sufficiently certain in that no term of the ground rents was given and there were no provisions in regard to the depth,

---

**3.** The land lying to the south of Contee Road combines Sections One (I), Two (II) and Three (III) of Briarwood.

size and character of the dwellings to be erected. Judge Pearce, for the Court, did indicate as an additional reason for his holding that the ground rents to be created did not exist when the contract of sale was made and that specific performance of an agreement to convey non-existent property would not be granted, citing two cases—one involving a patent which the defendant did not own, the other, stock in a corporation not organized at the time suit was filed—as authority for that statement.

*Newbold* is readily distinguishable from the case at bar in which the term of the ground rents and subrents is clearly given and there are no provisions involved in regard to the erection of specific houses.

The case at bar, in regard to certainty of terms of the ground rent or subrent, is analogous to the decision of the Court in *Serio v. Von Nordeck,* 189 Md. 388, 56 A. 2d 41 (1947) which involved an agreement to sell a tavern property in Baltimore City to the tenant "for $20,500 subject to a ground rent of $90.00 per year for 99 years, renewable forever." The seller raised the same defense of "non existent property" and relied on the *Newbold* case. The Court held that the bill of complaint of the purchasers stated a good cause of action for specific performance. Judge Markell, for the Court, stated at page 393 of 189 Md., pages 42-43 of 56 A. 2d:

> "Defendants also contend that the subject matter of the contract, *viz., a* leasehold estate in the property, is nonexistent and a court of equity 'will not decree specific performance of an agreement to convey property which has no existence.' *Ward v. Newbold,* 115 Md. 689, 694, 81 A. 793, 795, Ann. Cas. 1913A, 919. In substance and in form, this contention is without merit. In substance, speaking colloquially, it is no more difficult to enforce a contract to 'sell,' subject to a ground rent, than a contract to sell, subject to a purchase money mortgage. In form, speaking technically, it is no more difficult to enforce a contract to lease than a contract to sell. *Schluderberg v. Dietz, supra; Read Drug & Chemical Co. v. Nattans, supra.* Whether the consideration for the lease consists of rent only or

of rent plus a lump sum 'purchase price' makes no difference.

*Ward v. Newbold, supra,* does not support defendants' contention. In that case the vendors agreed to sell land and execute a deed to the vendee, to be held in escrow; the vendee agreed to pay the purchase price by (a) building houses (of unspecified size and plan) on the land, (b) 'creating ground rents' (i.e., leases for an unspecified term from the vendee to unascertained lessees) on the properties and (c) conveying the ground rents to the vendors. The contract was held not to be specifically enforceable because the term of the leases was unspecified; an additional reason mentioned was the fact that in the circumstances mentioned the contract involved the future creation of rents. Whatever the exact scope of the decision, it is not now in point."

(b)

Rocks also contends that the agreement of August 4, 1962 is too vague to be specifically enforced because it does not definitely set forth the manner in which the subdivision is to be carried out or the time of performance. We do not agree.

On this aspect of the case, the maxim *"Id certum est quod certum reddi potest"*, or, as translated into English, "That is certain which may be rendered certain" should clearly apply.

It is true that the exact time of the subsequent steps to be taken as agreed upon between Rocks and Brosius so far as the recordation of future plats and the execution of new subleases are concerned, is not specified in the agreement of August 4, 1962. Under these circumstances the legal implication is that these steps would be taken within a reasonable time. *Lawson v. Mullinix,* 104 Md. 156, 64 Atl. 938 (1906). The same rule applies when the time of payment is not stated in a mortgage. *Farrell v. Bean,* 10 Md. 217 (1856). Judge Boyd, for the Court in *Mullinix, supra,* stated:

" 'Very recently, in *Farrell v. Bean,* 10 Md. 223, this Court has said: "When no particular time of payment is limited in a mortgage, it is to be paid in a

reasonable time. And if the payment is not so made, the mortgagee is entitled to a foreclosure." ' In *Williamson v. Neeves,* 94 Wis. 656, it was held that the fact that no time was fixed for the conveyance of land was immaterial, because the legal implication would be that the conveyance was to be made within a reasonable time. Such time as was really necessary for the preparation of the deed, examination of the title, etc., would be allowed, and a Court of equity would see that such reasonable time was allowed." (P. 169 of 104 Md.; p. 943 of 64 Atl.).

The Rocks are in a difficult position to urge upon us that the agreements which their counsel drew are not enforceable because of vagueness when they were sufficiently definite to enable the parties to prepare, file and record the plats for Sections One (I), Two (II) and Three (III), prepare and execute the plats for Sections Four (IV) and Five (V) and prepare a tentative plat for Section Six (VI). The Rocks, as we have indicated, have abandoned their appeal as to the 91 lots covered by the plats for Sections One (I) and Two (II). In defending against the alleged contempt, the Rocks urged that the plat for Section Six (VI) was effective and binding on the parties. We can only conclude that the Rocks recognized that the terms were certain and definite.

So far as the payment of the rent is concerned the agreement of August 4, 1962 and the sublease of August 23, 1962 definitely fixed the payment of rents on the entire number of 255 lots to begin on October 1, 1963. Rent was paid and accepted on that basis and was to be paid currently every 6 months on the basis of $132.00 a year for each lot covering the 255 lots—or if the engineers so determine after the completion of the entire subdivision, 259 lots.

In regard to the time of filing the remaining plats for subdivision, it should be remembered that the *Rocks* had the obligation and power to proceed with the preparation and recordation of those plats. The terms of future subleases were to be those (except for the description) of the plats already executed and recorded. The terms were therefore certain and the time of performance was within the control of the Rocks by their

performance of their obligation. See *Trotter v. Lewis,* 185 Md. 528, 535, 45 A. 2d 329, 333 (1946) where we stated:

> "[W]e hold that, where a contract of sale does not show an intention that the purchaser is to have an extension of credit, the contract may be specifically enforced although it does not fix a definite time when the transaction is to be consummated, *because the time* of settlement *can be made certain by an offer to deliver the deed or by a tender of the purchase price.* (Emphasis supplied).

Then too, Brosius, having the absolute right of redemption under the agreement of August 4, 1962 and the redemption price of $2200.00 a lot having been established by the sublease of August 23, 1962, Brosius, after demand upon the Rocks and a tender of the purchase price, could have acquired all of the rights of the Rocks in the property subject to the rights of the Staggers.

The trial court, in our opinion, properly construed all the documents together as part of a single transaction constituting one contract for the subdivision and development of the Briarwood tract. A contract need not be evidenced by a single instrument. Where several instruments are made a part of a single transaction they will all be read and construed together as evidencing the intention of the parties in regard to the single transaction. This is true even though the instruments were executed at different times and do not in terms refer to each other. See *Kurz v. U. S.,* 156 F. Supp. 99 (S.D.N.Y. 1957); *In re Cooper's Estate,* 195 Kan. 174, 403 P. 2d 984 (1965); *International Milling Co. v. Hachmeister,* 380 Pa. 407, 110 A. 2d 186 (1955); *Doss Oil Royalty Co. v. Lahman,* 302 P. 2d 157 (Okl., 1956); *Levinson v. Linderman,* 51 Wash. 855, 322 P. 2d 863 (1958); *Neville v. Scott,* 182 Pa. Super. 448, 127 A. 2d 755 (1956). See also 17A C.J.S., *Contracts* §298, pages 128-132.

Assuming, without deciding, that the question is properly before us as it does not appear to have been raised before the Chancellor, see Maryland Rule 885, in our opinion, it was not necessary that the Staggers be parties to the present suit in

order to enable the Chancellor to grant specific performance. There had been no indication that the Staggers would not perform their obligations under the lease of February 5, 1962. The Rocks had the full leasehold estate in the property and the contractual relations were between the Rocks and Brosius. The rights of the Staggers are not affected by the decree passed in this case. There is no reason to believe that they will not fully perform their obligations as owners of the fee simple interest. The relief sought by the bill of complaint was against the Rocks. The Staggers were not necessary parties defendant. As Chief Judge Brune, for the Court, stated in *Klein v. Dove*, 205 Md. 285, 296, 107 A. 2d 82, 88 (1954):

> "The relief sought was against the defendants, and we believe that an effective decree can be, and was, entered without the joinder of the holder of that record title. Construing the decree, as we do, in accordance with the objectives stated in the bill of complaint, as determining rights and obligations only as between the plaintiffs and the defendants, and not as determinative of or as impairing any rights of the record title holder, we regard that person as only a formal or nominal party, and hence the record title holder need not have been joined as a party. *Miller, Equity Procedure*, Section 25."

### III.

The Rocks first contended before the Chancellor that the Rocks' purported "reentry" and "termination" of the agreements between the Rocks and Brosius were justified by the failure of Brosius to pay the rent due on October 1, 1963 and this is stated in the letter of counsel for the Rocks dated November 1, 1963. The Rocks secondly contended that the "reentry" and "termination" were justified by alleged "existing defaults in the terms and conditions of the several deeds of trust" as stated in the letter of November 15, 1963 from the Rocks to Brosius. The deeds of trust referred to were those of Loyola Federal, the lending institution which made all of the construction loans on Briarwood.

It is not clear that the Rocks press these contentions before us on this appeal, but, inasmuch as they are not specifically

abandoned and are considered in the brief of the appellees, we will briefly dispose of them.

As the Chancellor pointed out, the remedies of the sublessor under the agreement of August 4, 1962 and the sublease of August 23, 1962 upon default in the payment of rent were (1) to make distress (2) if the arrears continued for 60 days to reenter and hold the premises until the arrearages of rent and expenses incurred by the default were paid or (3) if the arrears were not paid for 6 months, to reenter and hold as if the sublease had not been made. The first remedy is not involved as no distress proceedings were instituted. The rent in arrears was tendered and the tender refused by the Rocks well within the 60 day period so that there was no right of reentry under either the second or third remedies given by the agreements.

As to any alleged existing defaults in the deeds of trust, there were none as the letter of November 20, 1963 from Loyola Federal clearly shows.

The Rocks' third contention is that the Rocks as sublessors may "reenter" and "terminate" because the taxes on Briarwood were not paid until December 31, 1963. This argument is based on the theory that in the Subordination Agreement of August 6, 1962 which was executed *only* by the Rocks and was not signed by Brosius, it was provided that a "default by the Lessees, or their assigns, in the *repayment* of any such loan, or loans, shall constitute a default by the Lessees under each and all of the sub-leases by reason of which the Lessors shall have the right to reenter the premises and terminate each and all of said subleases" (emphasis supplied) ; the sublessees, Brosius, have assented to this by acquiescence by not objecting to the terms prior to "termination"; the non-payment of taxes on October 1, 1963 was a default in the deeds of trust giving the trustee power to accelerate and exercise the power to sell in view of the provision "in the event there is a default in any payment * * * provided in any prior recorded trust * * * or prior liens of any kind including taxes" the lending institutions may accelerate and exercise the power to sell; and, that it is necessary for the sublessors as the original lessees to protect themselves in view of the provisions for forfeiture in the original lease of February 5, 1962.

In the first place, the obligation of the original lessees, the Rocks, and their assigns, and of the sublessees, Brosius, and their assigns, was set forth in identical language in the original lease and in the sublease "to pay the aforesaid rents, taxes and assessments *when legally demandable.*" (Emphasis supplied). As the Chancellor pointed out below and as counsel for the Rocks admitted at the argument before the Chancellor, the taxes in question were not "legally demandable" prior to January 1, 1964 and it is uncontradicted that Brosius paid the taxes on December 31, 1963 before they were "legally demandable." In short, Brosius did not breach the covenant in regard to the payment of taxes.

In the second place, if we assume, *arguendo,* that Brosius was bound by the provision of the Subordination Agreement of August 6, 1962—which was not signed by Brosius—that "obligation" was not to default "in the repayment" of any construction loan. As we have seen, Loyola Federal certified that there was no default in its loans, and in the absence of a default in the repayment of the loans there can be no justified "reentry" or "termination".

The Chancellor was correct in rejecting these three contentions of the Rocks and the purported "reentry" and "termination" were not justified.

IV.

Under the unusual facts in this case, we are of the opinion that the Chancellor did not err in denying the Rocks discovery of documents and other data in regard to Brosius' financial condition.

Maryland Rule 410a in regard to the scope of the examination of a deponent provides that "Unless otherwise ordered by the court, a deponent may be examined, either orally or upon written questions, regarding any matter, not privileged, which is *relevant to the subject matter involved in the pending action* * * *." (Emphasis supplied).

The Rocks demanded that Brosius produce financial records in regard to the project being constructed on Briarwood and in regard to the solvency of Brosius. Brosius, on advice of counsel, declined to produce the financial records or answer questions in regard to the matters mentioned. The refusal and

unanswered questions were referred to the trial court to compel production and answers. The Chancellor ruled that *at that time* the documents need not be produced nor the questions answered as their relevancy did not appear and their production would harass Brosius. The Chancellor, however, made it clear that "if at the time of the hearing the Court should feel * * * that it was necessary for us to have some proof of financial ability, if it were pertinent to the issues involved here, that then we would require it * * *."

At the trial, however, the Rocks introduced no evidence that Brosius was insolvent or otherwise unable to perform the obligations of the sublessee. There is no allegation of insolvency in the answer of the Rocks to the bill of complaint. Brosius, although late in paying the October 1, 1963 rent and not having paid the taxes until the day before they were legally demandable, always had paid his indebtedness and was not in default under the deeds of trust. Brosius had deposited into the Registry of the Circuit Court the accruing rent and was not in default on any of its obligations under the agreements at the time of trial.

The only relevance of the financial data was to show that Brosius was *unable to perform* his obligations. The proof showed that he was able to perform them and the Rocks did not offer any evidence to show that he was not able to perform.

The case of *Evergreen Amusement Corporation v. Pacheo*, 218 Md. 230, 145 A. 2d 774 (1958), relied on by the Rocks, presented quite a different factual situation from that presented by the case at bar. In *Evergreen* it was established at the trial that a tenant seeking a declaratory decree that it had not breached a lease was shown not to have paid its taxes when due; had not installed a drainage pipe it was obligated to install; had given checks for rent which had been returned by the bank marked "insufficient funds" (the bank having stated that it would be useless to redeposit the checks); had all of its assets subject to conditional sales contracts or mortgages; had open judgments of record against it; and, had its gate receipts attached. The Court held that this evidence established the tenant's insolvency and the forfeiture of the lease was justified. No facts of this type—readily available by inspection of public records or inquiry—were presented in the case at bar.

, In the absence of an allegation of insolvency or any substantial proof of insolvency, we are of the opinion that the Chancellor did not abuse his discretion in refusing to require Brosius to produce his financial records and answer the questions propounded to him by counsel for the Rocks attempting to obtain information. In any event, in view of the Chancellor's statement that he would require the production of financial data and the answering of questions in regard to this issue if the issue became relevant, the Rocks have suffered no prejudice by the Chancellor's ruling.

## V.

We have concluded that the order of January 11, 1965 adjudging the Rocks to have committed a civil contempt in allegedly violating the interlocutory injunction passed on May 14, 1964, is properly before us on this appeal and that the Chancellor erred in holding that the Rocks violated the provisions of the interlocutory injunction.

In the bill of complaint of Brosius, filed January 14, 1964, it was prayed that the Circuit Court issue an interlocutory injunction requiring that until the trial and determination of the suit: 1) the "Defendants shall not obstruct, interrupt or interfere with the *leasehold title* of the Plaintiffs * * * in and to said parcel consisting of 34.6860 acres divided into 91 lots" (emphasis supplied) 2) "the Defendants shall not obstruct, interrupt or interfere in any way with the right of the Plaintiffs to acquire *leasehold title* to the balance of said 94.5036 acre tract under the terms of the Agreement to Lease dated August 4, 1962;" (emphasis supplied) and 3) upon the sale of lots in the 34.6860 acre tract the defendants will promptly comply with all of the terms of the agreement of August 4, 1962 and the sublease of August 23, 1962. After the defendants answered and after holding a hearing, the Chancellor signed an interlocutory injunction on May 14, 1964, effective upon the posting of a $1000.00 bond "to compensate Defendant(s) for damages which may result if this restraint is proved to be wrongful and to remain in effect until further Order of this Court after the determination of the merits of the action", restraining the Rocks, Prince-Mar and their agents, successors and assigns as we have already set forth.

The interlocutory injunction was subject to a hearing on an application for a dissolution upon 10 days notice served at any time upon the plaintiffs by the defendants. Brosius duly posted the required $1000.00 bond.

On October 7, 1964, Brosius filed a petition to punish the Rocks and Prince-Mar, the defendants, for contempt of the interlocutory injunction. After reciting paragraphs 1 and 2 of the interlocutory injunction, it was alleged in the petition that beginning on or about September 21, 1964 and continuing until the present time, the defendants or their agents "have forceably entered upon a portion of the land which is the subject of the aforesaid agreement to lease to Plaintiffs, and, accordingly, a portion of the land covered by the aforesaid Interlocutory Injunction, and have graded a sixty (60) foot wide right of way through the tract, and in the course of such clearing, they have destroyed, damaged and removed valuable trees, reducing thereby the value of the premises, and further, Defendants have so graded the right of way as to remove a portion of a hilltop and thereby change the contour of the land in such a way as to interfere with Plaintiffs' planned use of the tract." It was further alleged in the petition that in performing the acts set forth above, the defendants "have cleared such right of way without the consent of the Plaintiffs herein, and further, that clearing such right of way is contrary to and interferes with the planned use to be made of the tract by Plaintiffs, and, further, that the existence of a graded right-of-way across the portion of the tract constitutes an encumbrance on the premises and restricts the use to which it can be put, and further, that the existence of such graded right-of-way adversely affects Plaintiffs' ability to convey its rights in and to the tract." Brosius prayed in the petition that 1) an order be issued to the defendants to show cause why they should not be adjudged in a civil contempt for violating the interlocutory injunction, 2) the court "adjudge the Defendants, its officers, agents, servants and employees in civil contempt for violation as aforesaid of the Order of this Court for an Interlocutory Injunction dated May 14, 1964, and with respect thereto award to Plaintiffs damages including but without limiting the generality hereof, damages for Court costs and counsel fees" and 3) for other and further relief.

The Rocks, on October 23, 1964 filed a "response" to the show cause order answering the petition of Brosius. The Rocks admitted that they had graded a 60 foot right of way through one of the unsubdivided parcels of land subject to the agreement of August 4, 1962 of which the plaintiffs "have not been in possession thereof at any time." The answer or "response" further alleged that the 60 foot right of way "connects two portions of the public streets known as Briarwood Drive, which portions of said drive have heretofore been dedicated to public use and lie on either side of said undivided parcel of land; and they are informed that before anyone can develop the said undivided portion of land the public authorities having jurisdiction thereover will require that a sixty-foot strip of land be dedicated to public use connecting the same portions of Briarwood Drive lying on either side of the said unsubdivided parcel of land." Any civil contempt is denied and the Rocks alleged that prior to grading the 60 foot right of way, they consulted counsel who advised them that in his opinion "the acts done by them do not in anywise effect their ability to convey the title of any portion of the unsubdivided parcel of land." A copy of a letter from counsel to the Rocks, dated August 12, 1964 and giving this opinion, was filed as an exhibit.

The Chancellor held a hearing on the petition, show cause order and answer on November 23, 1964. Substantial testimony was taken and a number of documentary and other exhibits were offered in evidence. The evidence indicated that the Rocks owned and were developing a parcel of land lying to the northeast of proposed Section Six (VI) known as "Mistletoe Manor" which was being improved by apartment buildings known as "Fox Rest." For convenience the Rocks cleared a 60 foot right of way as a "temporary haul road," for the hauling of materials. The 60 foot right of way thus cleared apparently followed the outlines of Briarwood Drive shown on the preliminary plat for Section Six (VI) of Briarwood and would connect the dedicated portion of Briarwood Drive on Mistletoe Manor with the dedicated portion of Briarwood Drive on Section One (I) of Briarwood. Mr. Rocks testified that the public authorities would require that the proposed portion of Briarwood Drive appearing on the preliminary plan for Section Six (VI) be dedicated

to public use so that there would be complete "circulation" for the accommodation of fire equipment and to connect with Contee Road. James O'Mara, a civil engineer and land planner testified that the Planning Commission had indicated "they wanted to have a connection with the Briarwood (Drive) in Briarwood Subdivision so that they would have a dedicated street running from Route 197 all the way to Contee Road." This would give better access to the contemplated public school in the area "so they could bring school buses from Contee Road or Laurel-Bowie Road, either way."

The Rocks owned some land south of Contee Road. Mr. Rocks believed that the temporary haul road would not only convenience him but would be a benefit to Brosius. Brosius disputed that the "temporary haul road" would be any benefit to him. On the contrary, he testified that he had intended to abandon the portion of Briarwood Drive where the Rocks had cleared the 60 foot right of way; that the Rocks had damaged him by removing fill which Brosius could have used in his own development; that the Rocks had destroyed valuable trees useful in Brosius' contemplated construction; that a storm water sewer had been improperly constructed; and, that the brush, trees, etc., had not been properly disposed of by the Rocks. Although Brosius gave some figures of alleged damage, he was not able to give full and comprehensive evidence establishing his alleged losses. Evidence was also given of a reasonable counsel fee for Brosius in connection with the contempt proceeding.

The Rocks never did use the "temporary haul road" as they did nothing in regard to it after they were served with the petition to punish for contempt and show cause order of October 7, 1964.

The Chancellor filed a memorandum and an order on January 11, 1965, in part, as follows:

> "After considering all testimony taken in open Court and the Memoranda submitted by Counsel for all parties, the Court finds that:
> "1. The defendants are technically in contempt of the court order of May 14, 1964, by reason of their cut-

ting and grading the roadway through the property involved in the within proceeding.

"2. The plaintiffs have failed to establish entitlement to damages herein at this stage of the proceedings.

"3. The plaintiffs are denied recovery for counsel fees.

"Accordingly, it is this 11th day of January, 1965, ORDERED that the defendants are in contempt of the Court's order of May 14, 1964, and are enjoined from further interfering in any manner whatsoever, with the subject property, until this cause is heard on its merits, reserving to the plaintiffs at that time the right to show damages, if any, by reason of the cutting and grading, the defendants to be held for any damage up to the time of the hearing to be held on the merits of this cause, by reason of the drainage situation caused by its past actions. Should drainage correction be necessary to avoid damage prior to said hearing, this Court shall be petitioned promptly for that purpose by the defendants herein."

Brosius indicated in his brief and argued before us (A) that the Chancellor's ruling of the civil contempt is not appealable and if appealable, (B) it was proper. We do not agree.

A.

The order of January 11, 1965 was interlocutory in nature. Although the Chancellor declared that the defendants were in contempt of the interlocutory injunction of May 14, 1964, it was an alleged civil contempt and no damages were assessed by the court. On the contrary, the issue of damages was expressly reserved for determination at a later date. The portion of the order of January 11, 1965 enjoining the defendants "from further interfering in any manner whatsoever, with the subject property until this cause is heard on its merits," is obviously temporary and interlocutory in nature. By virtue of Code (1957) Art. 5, §7, Subsections (a) and (e), the Rocks might have appealed from the order of January 11, 1965 as it did "grant an injunction" even though it was interlocutory and not

final and it did declare the Rocks guilty of a contempt. Generally an appeal to this Court from a court of equity may only be taken from a "final decree, or order in the nature of a final decree." Code (1957) Art. 5, §6. It is only from the interlocutory orders specifically mentioned in §7, that any appeal lies to this Court from interlocutory orders. Maryland Rule 887 provides:

"On an appeal from a final judgment, every interlocutory order which has previously been entered in the action shall be open to review by this Court unless an appeal has theretofore been taken from such interlocutory order and been decided on the merits by this Court."

*In Save-Mor Drugs, Bethesda, Inc. v. Upjohn Company,* 225 Md. 187, 170 A. 2d 223 (1961), we held that on an appeal from an order requiring a defendant to pay the plaintiff a certain sum as damages resulting from a civil contempt, the defendant could raise the question of the propriety of the finding by the Chancellor that the defendant had violated the interlocutory injunction previously issued under the Maryland Fair Trade Act, Code (1957) Art. 83, §§102-110. Chief Judge Brune, after a review of the prior Maryland cases, stated for the Court:

"Whatever the law may be in other jurisdictions or may previously have been in this State * * * it is clear that under Code (1957), Art. 5, § 7 (e), which is derived from Ch. 593 of the Acts of 1927, an interlocutory order entered by a court of equity 'remedial in its nature, adjudging in contempt of court any party to a cause or any person not a party thereto' is appealable (subject to an exception not here relevant). The appellee does not contend otherwise, but the fact that an interlocutory order is appealable does not define the scope of the matters open on appeal.

"The appellant, Save-Mor, could have appealed from the order granting the interlocutory injunction, but it was not bound to do so, and it could bring up for

review the questions which it might have so presented on appeal from the final decree. Maryland Rule 887; *Washington Cleaners & Dyers v. Albrecht,* 157 Md. 389, 146 A. 233." (P. 193-94 of 225 Md.; p. 227 of 170 A. 2d).

The Rocks were not required to mention the order of January 11, 1965 in the notice of appeal as contended by Brosius. The appeal from the final decree of February 23, 1965 brought before the Court *"every* interlocutory order which has previously been entered in the action" (emphasis supplied) by virtue of Maryland Rule 887. Cf. *Lippy v. Masonheimer,* 9 Md. 310 (1856) in which our predecessors held that a defendant who failed to answer and against whom an interlocutory decree was passed could nevertheless successfully challenge the interlocutory decree upon an appeal from the final decree. We are of the opinion that the interlocutory order of January 11, 1965 is properly before us.

### B.

The Rocks do not challenge the propriety of the issuance of the interlocutory injunction of May 14, 1964. They contend that their actions in September and October of 1964 in grading a "temporary haul road" did not violate the interlocutory injunction. We agree.

Maryland Rule BB78 in regard to the form and scope of orders for an injunction provides, in part, as follows:

> "a. *Form—Contents.*
> An order granting an injunction shall set forth the reasons for its issuance; shall be *specific in terms;* and *shall describe in reasonable detail,* and not by reference to the complaint or other document, *the act sought to be required or commanded or restrained or forbidden."* (Emphasis supplied).

This Rule (and its predecessor General Equity Rule), is declaratory of the chancery practice. See Miller, *Equity Jurisprudence,* §589, page 697. Where the terms of an injunction are not specific and definite, a defendant will not be punished for contempt. *Wells v. Osborne,* 204 Md. 375, 104 A. 2d 599

(1954). See also *Newell v. Dundalk Co.,* 149 Md. 182, 131 Atl. 148 (1925). See 43 C.J.S. *Injunctions* §206, pages 931-935.

It is well established that an injunctive decree must not be broader than the issue raised by the pleadings. *Chesapeake etc. R. R. Co. v. Richfield Oil Corp.,* 180 Md. 192, 23 A. 2d 677 (1942), cert. den., 316 U. S. 698, 62 S. Ct. 1297, 86 L. Ed. 1768 (1942).

It is the general rule in the United States that in proceedings to punish for the contempt of an injunctive order or decree that the courts will not expand the language of the decree by implication beyond the meaning of the terms of the order or decree when read in light of the issues and the purpose for which the suit was brought. Chief Judge Thomsen of the United States District Court for the District of Maryland expressed the general rule in *Carter Products v. Colgate-Palmolive Company,* 164 F. Supp. 503, 524 (1958), as follows:

> " 'In contempt proceedings for its enforcement, a decree will not be expanded by implication or intendment beyond the meaning of its terms when read in the light of the issues and the purpose for which the suit was brought, and the facts found must constitute a plain violation of the decree so read.' Terminal R. R. Ass'n of St. Louis v. United States, 266 U. S. 17, 29, 45 S. Ct. 5, 8, 69 L. Ed. 150. Courts do not make a 'strained and extreme construction' to spell out contempt of court. National Labor Relations Board v. Standard Trouser Co., 4 Cir., 162 F. 2d 1012, 1015."

The *Carter Products* case was affirmed by the United States Court of Appeals for the Fourth Circuit in *Carter Products, Inc. v. Colgate-Palmolive Company,* 269 F. 2d 299 (1959). The rule in Maryland is the same as the general rule. *Bosley v. Susquehanna Canal,* 3 Bland 63 (1829). See *Burnham v. Burnham,* 154 Md. 349, 352, 140 Atl. 361, 362 (1928).

In prayer for relief III, 2, of the bill of complaint, which we have already quoted in full, it was prayed that the interlocutory injunction, would, *pendente lite,* restrain the defendants from obstructing, interrupting or interfering with the right of Bro-

sius "to acquire *leasehold title* to the balance of the 94.5036 acre tract (which includes Section Six (VI)) under-the terms of the agreement of August 4, 1962." After the hearing, the Chancellor issued the interlocutory injunction. We have already quoted paragraphs 1 and 2 of the interlocutory injunction. Paragraph 1 restrains the defendants from obstructing, interrupting or interfering in any way with the leasehold title of the plaintiffs in the 34.6850 acre tract and paragraph 2 (the one involved in the contempt proceeding) restrains the Rocks from "making *or executing any encumbrance,* or taking other action, of record or otherwise, *to affect conveyance* in any manner *of the title* to any portion of the balance of the 94.5036 acre tract, except subject to and in complete acknowledgement of all of the rights of Brosius set forth in the agreement of August 4, 1962." (Emphasis supplied).

The language of the interlocutory injunction is intended to prevent the Rocks, *pendente lite,* from placing an encumbrance upon the title, whether of record or otherwise, which, if in the hands of a bona fide purchaser might frustrate the final decree of the court granting specific performance. This is what the interlocutory injunction states; it is what the bill of complaint prayed for in its prayer for relief III; it is what is suggested by the small bond of $1000.00. The language of the interlocutory order of May 14, 1964 *does not* enjoin the defendants from "interfering in any manner whatsoever, with the subject property until this case was heard on the merits" as was provided in the interlocutory injunction of January 11, 1965.

There are two types of encumbrances: 1) those affecting title, and 2) those affecting the physical condition of the property. In 42 C.J.S. *Incumbrance or Encumbrance,* page 551, it is stated:

"Encumbrances * * * generally * * * are of two kinds: (1) Those which affect the title. (2) Those which affect only the physical condition of the property. A mortgage or other lien is a fair illustration of the former; a public road or a right of way of the latter."

Brosius suggests that the words of "record *or otherwise"* would broaden the scope of the word "encumbrance" to include an encumbrance affecting the physical condition of the property. This argument, however, overlooks the next phrase *"to affect conveyance in any manner of the title* to any portion or all" of the balance of the 94.5036 acre tract. The words "or otherwise" relate to encumbrances affecting the conveyance of title other than of record, such as subleases for less than a term of 7 years which by virtue of Code (1957) Art. 21, §1 are not required to be recorded. It would be a strained construction indeed to give the words "or otherwise" the meaning of an encumbrance affecting the physical condition of the property without reference to the title of the property. In our opinion, counsel for the Rocks was justified in advising his clients that the proposed clearing of the land for a "temporary haul road" would not violate the interlocutory injunction of May 14, 1964, as this temporary haul road could not be construed to be any implied grant of an easement of way as suggested by Brosius. The Rocks were the leasehold owners of the land over which the temporary haul road was erected and they also owned Mistletoe Manor, the land to the northeast of the haul road. An owner of realty "does not have an easement in his own land since the bundle of rights which adds up to ownership includes the right corresponding to the easement." *Dalton v. Real Estate & Improvement Co.,* 201 Md. 34, 46, 92 A. 2d 585, 591 (1952). There was no writing evidencing such a purported easement as would be required for a grant of this interest in land by the subsection 4 of Section IV of the Statute of Frauds. 29 Charles II, Chapter 3, 2 Alexander's British Statutes, (Coe's Ed.), pages 689, 690, 703-705. The temporary haul road had not been used at all by the Rocks because of the filing of the petition to punish for contempt and was, of course, not used adversely for the 20 year period necessary for an easement by prescription. See *Dalton v. Real Estate & Improvement Co., supra.*

The Chancellor was able to grant effectively the specific performance to which Brosius was entitled, so that it is apparent that the purpose of the interlocutory injunction of May 14, 1964 was not frustrated or impaired by the clearing of the tem-

porary haul road. The Chancellor relied on the preliminary plat for Section Six (VI) in order to give specific peformance for that portion of Briarwood. The Rocks had the power and the duty under the agreement of August 4, 1962 to prepare such a plat which admittedly shows Briarwood Drive over Section Six (VI) in substantially the location of the temporary haul road. The Rocks merely followed the preliminary plat on which specific performance is granted. The clearing of the temporary haul road in no way prevented a transfer of the Rocks' leasehold title to Brosius.

We conclude that the clearing of the temporary haul road did not violate the provisions of the interlocutory injunction of May 14, 1964 and the Chancellor was in error in finding that the Rocks were guilty of a "technical violation" of that injunction. That portion of the order of January 11, 1965 reciting that the defendants were in contempt of the court's order of May 14, 1964, will be reversed.

V.

We will now consider whether Brosius is entitled to damages in addition to the relief of specific performance and declaratory relief given by the decree of February 11, 1965.

Brosius is not entitled to damages for any alleged violation of the interlocutory injunction of May 14, 1964 as we have held that the Rocks did not violate that interlocutory injunction. Cf. *Save-Mor Drugs, Bethesda, Inc. v. Upjohn Co., supra.* This, however, does not completely dispose of the question of damages as Brosius in paragraph I, 4, of the prayers for relief in the bill of complaint claimed damages resulting from the delay in the completion of any home resulting from the Rocks' failure to perform, and prayed for other and further relief. In addition, as we have indicated, Brosius claims that he was damaged as a result of the Rocks' clearing of the temporary haul road because of improper performance of the work itself and also because Brosius had determined not to place Briarwood Drive in the location of the temporary haul road. Both elements of damages are consistent with relief by way of specific performance. We considered the question of damages resulting from delay in a specific performance case in *Miller v. Talbott,* 239 Md. 382, 211 A. 2d 741 (1965). We held in *Talbott* that the

plaintiff could claim damages for delay in conveying the subject property under a prayer in the bill of complaint for other and further relief. We quoted with approval from Pomeroy's *Treatise on Equity Jurisprudence* (5th ed. 1941), Vol. 1, §237b as follows:

> "As an outgrowth of the doctrine that a court of equity, when jurisdiction is once assumed on equitable grounds, will adjudicate all matters properly presented by and actually involved in the case at hand, it is ordinarily held that where the case is a proper one for specific performance the chancellor may, as an ancillary to the relief given, decree compensation or damages. Hence, having jurisdiction for the purpose of specifically enforcing performance of a contract, the chancellor has full jurisdiction, in addition to decreeing specific performance, to award such legal damages as have resulted from delay in performance of the contract."

We are of the opinion that damages allegedly resulting from the clearing of the temporary haul road are similar to damages resulting from delay. See 81 C.J.S. *Specific Performance* §162, pages 769-770 where it is stated:

> "In an otherwise proper case the plaintiff may in addition to securing specific performance recover damages for delay in performance or for injury to the freehold. * * *
>
> "The purchaser may be entitled to damages for injury to the freehold by the vendor's, or, under certain circumstances, a third person's improper acts or neglect. The right of plaintiff purchaser to recover for waste has been denied, however, where defendant has placed improvements on the land greater in value than the amount of the damage caused by the waste."

See *Lynch v. Wright*, 94 Fed. 703 (Cir. Ct. S. D. N. Y. 1899); *Murdock v. Pope*, 156 Colo. 7, 396 P. 2d 841 (1964); *Reinink v. Loozenoord*, 370 Mich. 121, 121 N. W. 2d 689 (1963); *Bostwick v. Beach*, 105 N. Y. 661, 12 N. E. 32 (1887); *Caveny*

654

*v. Asheim,* 202 Or. 195, 274 P. 2d 281 (1954) ; *Bright v. James,* 35 R. I. 492, 87 Atl. 316 (1913) ; *Taylor v. Highland Park Corporation,* 210 S. C. 254, 42 S. E. 2d 335 (1947) ; *Latimer v. Marchbanks,* 57 S. C. 267, 35 S. E. 481 (1900) ; *Mayer v. Manufacturers Trust Co.,* 11 Misc. 2d 359, 170 N. Y. S. 2d 43 (Sup. Ct. 1957). See also Annot., *Depreciation pending specific performance,* 105 A.L.R. 1421; Annot., *Specific performance: compensation or damages awarded purchaser for delay in conveyance of land,* 7 A.L.R. 2d 1204, 1231-1233.

In our opinion the alleged damages resulting from the clearing of the temporary haul road as contended for by Brosius may properly be raised, like a claim of damages for delay in performance, under the prayer for other and further relief in the bill of complaint. As the Chancellor has reserved the question of damages in paragraph 4 of the decree of February 11, 1965, not only for damages resulting from the contempt (which are eliminated by our decision) but also as to "the wrongful eviction of defendants from all of Briarwood", we will remand the case for the determination by the Chancellor of any damages allegedly resulting (1) from delay in performance or (2) from the clearing of the temporary haul road over Section Six (VI) either resulting from alleged improper clearing, removal of fill, installation of storm-water sewers or other alleged improper conduct, or resulting from an abandonment of the location of Briarwood Drive over Section Six (VI) by Brosius. The Chancellor will, of course, consider whether and to what extent, if any, Brosius may have benefitted from the clearing of this portion of Section Six (VI).

> *The portion of the order of January 11, 1965 declaring that the defendants are in contempt of the lower court's order of May 14, 1964 reversed, the remaining portion of the order of January 11, 1965 and the final decree of February 11, 1965 affirmed, and the case remanded to the*

612]

*trial court for further proceedings in accordance with this opinion, the appellants to pay nine-tenths of the costs and the appellees to pay the remaining one-tenth of the costs, future costs attendant upon the remand of the case to abide the result in, and the determination by, the trial* **court.**