192 So.2d 409 (1966)
GILCHRIST TRACTOR COMPANY, Inc.
v.
Roger W. STRIBLING.
No. 44104.
Supreme Court of Mississippi.
November 28, 1966.
Suggestions of Error Overruled January 16, 1967.
*411 Brunini, Everett, Grantham & Quin, George P. Hewes, III, W.T. Jones, Jackson, for appellant.
Wells, Thomas & Wells, Erskine W. Wells, Jack W. Brand, Jackson, for appellee.
SMITH, Justice.
This is an appeal by Gilchrist Tractor Company, Inc., from a decree of the Chancery Court of the First Judicial District of Hinds County, awarding Roger W. Stribling, appellee and cross-appellant, a money judgment against it in the sum of $140,000, plus interest and $3500 as attorneys' fees, and declining to allow certain set-offs.
Suit was brought originally by Stribling against Gilchrist in the Circuit Court of Hinds County seeking to recover a principal balance of $140,000 on a promissory note, plus interest and attorneys' fees as provided in the note. Gilchrist answered and pleaded two set-offs totaling $76,289.84. The case was transferred to the Chancery Court of the First Judicial District of Hinds County where it was tried, and the decree appealed from was entered.
Stribling has cross-appealed, contending that the trial court allowed an inadequate attorneys' fee, and also was in error in excluding certain oral testimony relating to alleged conversations dealing with one of the amounts claimed as a set-off.
Since the entry of the judgment, the uncontested portion of indebtedness has been paid.
For eighteen years, Roger W. Stribling had been the exclusive franchise dealer for Caterpillar Tractor Company. His territory comprised the entire southern half of the State of Mississippi. He maintained offices in the cities of Jackson, Meridian, Gulfport, and Natchez. The Jackson, Gulfport and Natchez offices were operated through Stribling Brothers Machinery Company, a corporation wholly owned by Roger W. Stribling and his wife. The Meridian office was operated as Stribling Tractor Company, a separate corporation also owned by the Striblings.
In April 1962, Ben Puckett, an employee and officer of Stribling Brothers Machinery Company, asked Stribling if he would be interested in selling the business. Puckett informed Stribling that he was acquainted with a Mr. Gilchrist of Alabama who might be interested in joining Puckett in the purchase. Afterward, several conferences were held between Gilchrist, his two sons, and Puckett, on the one hand, and Stribling on the other, resulting in an offer of $1,815,090.40 for the purchase of the business, and this was accepted by Stribling.
A written agreement was entered into between the parties, date May 23, 1962, and styled, "Contract for Purchase and Sale of Corporate Stock." This agreement covered the basic aspects of the transaction and enumerated certain specific areas to be covered more in detail on a later date by further written contracts, the parties agreeing to work toward a final closing date of June 1, 1962.
Under the May 23rd agreement, Gilchrist, his two sons, and Puckett would acquire all of the stock in the two Stribling corporations for $1,815,090.40, each of them to acquire one-fourth of the stock.
*412 The May 23rd agreement, among other things, stipulated that the purchasers assumed payment of an indebtedness of Stribling Brothers Machinery Company to Roger W. Stribling, individually, in the amount of $250,000, evidenced by a promissory note described in the agreement. Later on, by agreement with Stribling, Gilchrist returned to Stribling a Beechcraft airplane, which he concluded he did not need, and obtained credit for it on this debt in the amount of $110,000, leaving an unpaid balance of $140,000. This balance is the subject of the present suit.
Notwithstanding the execution of the purchase and sale agreement of May 23rd, it was understood by the parties that a condition precedent to final consummation was the obtaining by Gilchrist of the Caterpillar Tractor Company's exclusive dealership franchise for southern Mississippi. This franchise was not an asset of the Stribling corporations, was not salable or transferable by Stribling, and might only be obtained by a grant from Caterpillar. Both parties recognized this fact, and that the business would be of little or no value without the franchise.
Under a policy of Caterpillar Tractor Company, Inc., before granting a franchise, that Company made an independent investigation and had to be satisfied of the worth, reputation and integrity of the proposed buyers. Also, Caterpillar had to be convinced that the terms of the transaction were sound from the buyer's standpoint, and that the buyer was receiving value for his money.
In pursuance of that policy, in May 1962, auditors of the Caterpillar Tractor Company came to Jackson for the purpose of making their investigation. Both Stribling and the Gilchrists were interested in obtaining the approval of Caterpillar. To that end, it was desirable that the books of the Stribling corporations reflect the best possible financial picture.
Sometime between the years 1955 and 1957, W.G. Cook, acting for Cook Construction Company, one of the customers of Stribling Brothers Machinery Company, made a deal with the latter company, whereby certain of Cook's used equipment was taken in by Stribling with the understanding that Cook would be allowed credit for the equipment in the amount of $175,000, which he might use, from time to time, and proportionately, when and as he should purchase new Caterpillar equipment, to the value of $1,000,000. Stated differently, under the agreement with Stribling, Cook was entitled to credit upon future purchases of Caterpillar equipment at the rate of 17 1/2% of the purchase price of equipment purchased, until the entire sum of the $175,000 credit was consumed.
In mid 1957, Cook bought new equipment from Stribling which consumed about 60% of the credit, and, in the ensuing years, as the result of transactions involving the purchase by Cook of equipment from Stribling, as well as the sale by Cook of portions of the credit to others who used it in the purchase of equipment, the amount of this credit which remained unused had been reduced from $175,000 to $60,986.66 at the time Gilchrist purchased the business from Stribling.
It was this credit balance, referred to in the record and briefs as the "Cook credit", which Gilchrist pleaded as one of two set-offs against the indebtedness sued upon.
Pursuant to the original contract of May 23, 1962, six supplemental contracts were prepared and executed by the parties as of June 1, 1962. These were the contracts expressly contemplated under the terms of the original agreement of May 23rd.
Paragraph 5 of the original agreement of May 23rd was as follows:
"Sellers agree to execute documents in satisfactory form agreeing to indemnify and hold harmless the Purchaser from any liabilities for federal and state income taxes accruing or for activities conducted prior to the transfer of stock *413 as provided for herein, except that the Purchaser shall be liable for the state and federal income tax liabilities as disclosed by the tax returns, as approved by sellers or their representative, that have not been filed as of the date of such transfer, and also agreeing to indemnify and hold harmless Purchaser from liabilities that are not reflected by the books of the company or are not normal and usual in the conduct of the business of such company. By way of illustration but not limitation, Purchaser would be responsible for service fees, warranties, and items of that nature, whereas the indemnity agreement would cover tort claims that are not covered by insurance, obligations on any contracts that are not reflected in the files or records of the company, any penalties or liabilities for violating any law, and matters of that nature."
Among the June 1, 1962, documents was one styled, "Agreement", which contains this language in Paragraph 1:
"Roger W. Stribling does hereby agree to indemnify and hold harmless Gilchrist Tractor Company, Inc. from any liabilities for federal and state income taxes accruing or for activities conducted prior to midnight, May 31, 1962, except that Gilchrist Tractor Company, Inc. shall be liable for the state and federal income tax liabilities as disclosed by the tax returns, as approved by Roger W. Stribling, or his representative, that have not been filed as of such date, and with the further exception of any tax liability resulting from re-appraisal of inventory, expendible supplies, prepaid items and small tools and also the write-off of accounts receivable and notes receivable. Roger W. Stribling further agrees to indemnify and hold harmless Gilchrist Tractor Company, Inc. from any liabilities that are not reflected by the books of Stribling Bros. Machinery Co. Inc. and/or Stribling Tractor Co. or are not normal and usual in the conduct of the business heretofore conducted by the said Stribling Bros. Machinery Co., Inc. and/or Stribling Tractor Co. By way of illustration, but not limitation, Gilchrist Tractor Company, Inc. is to be responsible for service fees, warranties and items of that nature, whereas this indemnity agreement of Roger W. Stribling would cover tort claims that are not covered by insurance, obligations on any contracts that are not reflected in the files or records of the company or known by officials of Gilchrist Tractor Company, Inc. as of the date hereof, any penalties or liabilities for violating any law, and matters of that nature."
Another of the June 1st agreements, entitled, "Non-Competition Agreement" prohibits Stribling, either directly or indirectly, from entering into competition with Gilchrist's business of selling or renting machinery furnished by Caterpillar Tractor Company within the State of Mississippi for a period of five years. This document contains only a single exception, which is stated in the following definitive language:
"It is understood that Roger W. Stribling now owns certain machinery and equipment and he may proceed with the orderly liquidation or disposal of said equipment and machinery by either sale or rental purchase agreements. * * *"
In preparing for the visit of the Caterpillar auditors and in anticipation of the examination of the books of Stribling Brothers Machinery Company, it was decided that certain items should be removed from the books of that company. In removing these items, it does not appear that there was intention to deceive but only that they might present a "better picture" to Caterpillar. Moreover, the items were specifically dealt with in one of the June 1st agreements.
One of the liabilities thus removed was that in favor of Cook Construction Company for the balance of the "Cook credit," in the amount of $60,986.66. The other, apparently in the same status, was a credit due Hyde Construction Company, in the *414 amount of $19,562.06. These liabilities totaled $80,548.72. Also removed at the same time were five accounts receivable, likewise totaling $80,548.72.
These matters were dealt with in detail in that one of the June 1st contracts styled, "Agreement" as follows:
"Gilchrist Tractor Company, Inc. hereby expressly agrees to pay to Roger W. Stribling any amounts received from any undisclosed assets, including net amounts of bad debts recovered that were written off prior to September 30, 1961 by Stribling Bros. Machinery Co., Inc. and that were written off prior to November 30, 1961 by Stribling Tractor Co. In addition, it is agreed that Roger W. Stribling shall be personally responsible for any liability or responsibility of Gilchrist Tractor Company, Inc. or Stribling Bros. Machinery Co., Inc. to Cook Construction Company and Hyde Construction Company growing out of any contracts with either or both of said companies to furnish equipment at less than retail prices and that Roger W. Stribling shall be paid the net amount of any proceeds received from the collection of those certain accounts that were written off by Stribling Bros. Machinery Co., Inc. during the calendar year 1962, to-wit, Hyde, Inc. in the amount of $17,133.93; Madison Land Improvement Company in the amount of $30,000.00; Hyde Construction Company in the amount of $24,147.70; Hyde Construction Company in the amount of $6,064.04; and Hyde Construction Company in the amount of $1,637.31. In other words, the foregoing accounts which have been written off as bad debts by Stribling Bros. Machinery Co., Inc. in the year 1962 shall belong to Roger W. Stribling and any payments received thereon or any collections made thereon shall be in the category of bad debts written off by Stribling Bros. Machinery Co. prior to September 30, 1961, and Roger W. Stribling shall receive the net proceeds of any such collections or payments. Gilchrist Tractor Company, Inc. agrees to furnish to Roger W. Stribling, or his representative, a list of all bad debts referred to in this paragraph and agrees that Roger W. Stribling, or his representative, may make all reasonable efforts to collect same, including the filing of suit, if necessary, and same may be done in the name of Gilchrist Tractor Company, Inc., or, if Gilchrist Tractor Company, Inc. is advised by its attorneys that such is proper and will not damage Gilchrist Tractor Company, Inc., then any such suit may be brought in the name of Stribling Bros. Machinery Co., Inc. or Stribling Tractor Company. In the event the determination is made to file such suit in the name of Roger W. Stribling, then Gilchrist Tractor Company, Inc. agrees to make the necessary assignment of such claims to the said Roger W. Stribling or his designee."
In this paragraph, Stribling assumed responsibility for the Cook and Hyde credits, totaling $80,548.72 and received accounts receivable, totaling $80,548.72.
There is considerable testimony, in which there is some conflict, as to the circumstances surrounding removal of these items from the books of Stribling Brothers Machinery Company prior to their examination by Caterpillar. It appears, however, that all parties were aware of their removal and they were made the subject of the above specific contract provision. All parties knew of and consented to the removal of these items or acquiesced in their removal. This was done in order that the books might reflect a better picture when they were examined by the auditors for Caterpillar. Of course, the removal of the Cook credit from the company's books had no effect whatever upon its fixed obligation or liability to Cook, or upon his right to have it honored.
In 1964, Cook placed an order with Gilchrist for Caterpillar equipment to the value of approximately $500,000, on which he was entitled to the 17 1/2% credit to the extent of the $60,986.66 which then *415 remained unused. His order was filled by Gilchrist and the $60,986.66 credit, as well as an additional discount, was allowed. Gilchrist called on Stribling to reimburse him and Stribling refused to do so. Stribling informed Gilchrist that he had arranged with his brother, who was the Caterpillar dealer for northern Mississippi, to obtain, at dealer's cost, any equipment that Cook might order after the sale of the business to Gilchrist, and that he, Stribling, was entitled to supply Cook with Caterpillar equipment in this manner.
It is the position of Gilchrist that it is entitled to indemnity from Stribling, under the terms of the contracts, in the amount of $60,946.66, the amount of credit allowed Cook on the purchase of the Caterpillar equipment. This claim comprises one of the set-offs asserted by Gilchrist and disallowed by the trial court.
It is to be noted that the contract provision quoted above does not make Stribling "responsible" for supplying the equipment. It makes him responsible for the "liability or responsibility" of the corporation to Cook. This liability consisted of the $175,000 credit allowed him for the used equipment which he had, in effect, sold to Stribling several years earlier. It was this credit or this amount due Cook for which Stribling made himself responsibile. The language of the contract relating to this item cannot be construed as allowing Stribling to retain the right to supply Caterpillar equipment to Cook, a customer whose business with the company had been substantial over a period of years, for such time as might be necessary to consume the $60,986.66 balance of the credit. Cook had used the credit over a period of years, through allowances on purchases and by sale of portions of it, so that the original $175,000 credit had been reduced to $60,986.66.
It was the fundamental and basic purpose of all parties to the transaction that Gilchrist should become the successor to Stribling as the exclusive Caterpillar franchise dealer for southern Mississippi. It is inconsistent with this purpose to construe the words of the agreement as allowing Stribling to retain two customers, Cook Construction Company and Hyde Construction Company, each of whom had credits due them by the corporation, and to sell them Caterpillar equipment until these credits had been exhausted.
Emphasis is given this aspect of the matter when it is considered that the dealer's price was "20 plus 2" off of list, making a discount to the dealer of 22% in cash transactions, such as the one here. This would have entitled Stribling to make a profit of 4 1/2% on the $350,000 purchase on which the credit was allowed by Gilchrist, or $15,750.00.
The provisions of the agreement executed by Stribling prohibiting him from competing in the sale of Caterpillar equipment in Mississippi for five years are also relevant to a determination of the intention of the parties as to this matter.
There is one, and only one, exception to the prohibition. It is stated clearly, in unmistakable terms:
"It is understood that Roger W. Stribling now owns certain machinery and equipment and he may proceed with the orderly liquidation or disposal of said equipment and machinery by either sale or rental purchase agreements."
This is the only exception, and must be construed as negativing the suggestion that it was intended that there should be others.
Where only one exception is mentioned in a contract, the rule of expressio unius est exclusio alterius applies and exceptions not mentioned cannot be engrafted upon it. Chatham Pharmaceuticals, Inc. v. Angier Chemical Co., Inc., 347 Mass. 208, 196 N.E.2d 852 (1964); Portland Web Pressman's Union, Local 17 v. Oregonian Pub. Co., 188 F. Supp. 859 (D.C.Or. 1960), aff'd 286 F.2d 4 (9th Cir.1960), cert. denied 366 U.S. 912, 81 S.Ct. 1086, 6 L.Ed.2d 237 (1961).
*416 If it had been contemplated that Stribling should continue to have the right to supply Cook or Hyde with Caterpillar equipment until these credits were exhausted in the course of writing seven contracts, it would have been easy to say so. The logical assumption is that, if it had been so intended, there would have been some reference to the fact, especially since the retaining of such a right by Stribling is inconsistent with the basic purpose of the main transaction, and would be an exception to the Non-Competition Agreement.
As far as Cook was concerned, a material consideration in the purchase by Gilchrist was the application of the dealer warranty as well as the manufacturer's warranty. The obligation, as to Cook, was fixed and inescapable. His right was to buy from the franchise Caterpillar dealer, where he might expect not only the dealer warranty but dealer service as well. There was no legal compulsion requiring Cook to purchase from Stribling after Stribling had disposed of his agency and withdrawn from the business. The evidence indicates that Cook would not have done so.
Gilchrist was not a volunteer in allowing the credit to Cook upon the purchase of Caterpillar equipment. When called upon to honor its obligation with respect to this matter, Gilchrist, as successor to Stribling Brothers Machinery Company, had no alternative but to do so. Moreover, it was the legitimate business of Gilchrist, as the Caterpillar dealer, to supply the equipment and to earn the profit. It was not necessary to notify Stribling in advance. All of the circumstances were known to him, and the items had come to his attention when they were removed from the books of the Stribling Brothers Machinery Company and they were made the subject of special provisions in the written agreements. The value allowed for the used equipment was fixed when it was taken in by Stribling between 1955 and 1957, long before any contemplated sale to Gilchrist. The credit was a fixed and liquidated legal obligation to Cook. 6 Am.Jur.2d Assignments § 110 (1963).
The chancellor was in error in holding that Gilchrist, in honoring the Cook credit, was a volunteer. He was also in error in construing the contract as permitting Stribling to supply the equipment.
The word "responsible" has been construed to be synonymous with the word "liable." Penn v. Commercial Union Fire Ins. Co., 233 Miss. 178, 101 So.2d 535, 67 A.L.R. 2d 1238 (1958).
Thus, under the terms of the agreement, Stribling made himself liable for the liability of Gilchrist to Cook growing out of the contract to furnish equipment at less than retail price. The effect of this agreement was to require Stribling to indemnify Gilchrist for any amount which it became necessary for the latter to allow Cook, as successor to Stribling, upon the purchase of new equipment under the terms of the agreement with Cook. Gilchrist's claim of set-off for the amount allowed Cook should have been sustained.
The second set-off claimed by Gilchrist, and disallowed by the trial court, is based upon certain employee accounts, consisting of amounts charged on the books of Stribling Brothers Machinery Company and transferred to Gilchrist under the terms of the general assignment of assets, which Gilchrist charged could not be collected because the employees did not owe the accounts. Gilchrist contended that there was an implied warranty of validity and offered proof, which the trial court declined to receive, that the accounts were invalid, and that nothing was owed by the employees.
The chancellor held that there was no express warranty as to these accounts, and, none being implied in law, Gilchrist was not entitled to set-off their amounts against the note, regardless of whether they were valid or invalid. He declined to hear evidence touching the validity of the accounts, or upon the issue as to whether the *417 accounts were or were not owed by the persons against whom they were charged.
Appellee contends that there was no express warranty as to these accounts anywhere in the contracts, and no implied warranty. Appellee also suggests that Gilchrist had not used reasonable diligence in an effort to collect these accounts, and that they had not been collected for this reason.
The rule is stated in 6 Am.Jur.2d Assignments section 107 at 289-290 (1963):
"* * * A warranty of title is implied on the sale of a nonnegotiable chose in action so that if the chose is a nullity, the assignee may recover its price irrespective of the seller's ignorance of the defect.
"Even though the assignment is made `without recourse,' there is an implied warranty that the chose assigned is what it purports to be, namely, a valid and genuine obligation of the parties; that the right as assigned actually exists and is subject to no limitations or defenses other than those stated or apparent at the time of the assignment; * * *."
See also 6 C.J.S. Assignments § 101 at p. 1157 (1937) and Restatement, Contracts § 175 at 225 (1932).
The trial court was in error in holding that there was no implied warranty as to validity and in declining to hear testimony upon the question of its breach.
The case will be remanded in order that the trial court may hear evidence as to whether or not the accounts were subsisting legal obligations of the parties against whom they were charged at the time they were transferred to Gilchrist.
If it should be found that they were not valid, then the Gilchrist counter-claim should be allowed, unless it should be further determined that Gilchrist took the accounts with such information and knowledge of the relevant surrounding circumstances as to amount to notice of their invalidity and constitute a waiver of the implied warranty, in which case the counter-claim should be denied. Likewise, the counter-claim should be denied if it should be determined that the claims were valid and that failure of Gilchrist to collect has been due to a failure on its part to use reasonable diligence to effect collection.
On cross-appeal, the chancellor was correct in declining to receive parol evidence of conversations alleged to have occurred between the Gilchrists, Puckett and Stribling prior to the execution of the written contracts. In this case, the parties first entered into a preliminary written agreement which provided, among other things, that further written agreements would be made later, dealing more specifically with each of the several aspects of the transaction. This was done, and these contracts, prepared later in the light of the developed facts, supplemented the original written agreements and superseded prior oral agreements, if any. They dealt with the same subject matter and the contracting parties were the same. Under the circumstances here, each document is a component part of the contract covering the over-all agreement, and all must be considered together in order to determine the intention of the parties as finally arrived at. Prior discussions and oral agreements, if any, were merged into and superseded by the final agreements of the parties as reflected by their detailed written contracts. The provision relating to the Cook credit is not ambiguous, and, in any event, it must be considered in the context of the whole agreement.
The rule is stated in 17 Am.Jur.2d Contracts section 264 (1964) as follows:
"The general rule is that in the absence of anything to indicate a contrary intention, instruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together, since they are, in the eyes of the law, one contract or instrument. * * * Id. at 668.

*418 "Construing contemporaneous instruments together means simply that if there are any provisions in one instrument limiting, explaining, or otherwise affecting the provisions of another, they will be given effect as between the parties themselves and all persons charged with notice so that the intent of the parties may be carried out and the whole agreement actually made may be effectuated. * * * Id. at 670.
"Where the terms employed to express some particular condition of a contract are ambiguous and cannot be satisfactorily explained by reference to other parts of the contract and the parties have made other contracts in respect of the same subject matter, apparently in pursuance of the same general purpose, it is always permissible to examine all of them together in aid of the interpretation of the particular condition; and if it is found that the ambiguous terms have a plain meaning by a comparison of the several contracts and an examination of their provisions, that meaning should be attributed to them in the particular condition." Id. at 671.
In Restatement, Contracts section 235 at 319 (1932), the rule is stated:
"* * * all writings forming part of the same transaction are interpreted together."
Also assigned as error by Stribling, as cross-appellant, is the action of the trial court in fixing $3500 as reasonable attorneys' fees for the services of his attorneys in the trial of the case.
The fee in question was fixed by the chancellor under a contract provision in the note, whereby the maker, Gilchrist, agreed to pay a "reasonable attorneys' fee on principal and interest if this note be placed in the hands of an attorney for collection." It is not contended by appellant that no fee should have been allowed.
There was no contest of the note itself. The allegations of the complaint, as to the note, were admitted in the answer. The contest in the court below was confined to the two set-offs asserted by appellant, and the principal services of the attorneys for appellee and cross-appellant at the trial were devoted to the defense of these claims which approximated $70,000. The fixing of reasonable attorneys' fees is a matter ordinarily within the sound discretion of the trial court, and, while the fee in this case may be characterized as modest, under the circumstances, it is impossible to say that there was a manifest abuse of discretion on the part of the chancellor in fixing the amount of the fee. Therefore, the case will be affirmed on cross-appeal.
Reversed in part on direct appeal and judgment entered here for appellant sustaining the set-off based upon the Cook credit; reversed and remanded as to the set-off based upon the employee accounts; affirmed on cross-appeal.
JONES, PATTERSON, INZER, and ROBERTSON JJ., concurs.