ROBERTSON, Justice:
This appeal involves a determination of whether a farm-out letter dated December 10, 1959, which was signed and agreed to by Phillips Petroleum Company, Shreveport, Louisiana, appellant, and J. E. Stack, Jr., one of the appellees, was merged into md superseded by an assignment of oil and gas leases dated December 11, 1959, also signed and executed by both Phillips and Stack, or whether both instruments together constituted the contract between the parties.
After both sides had rested, the Chancery Court of Clarke County sustained a motion to exclude the evidence and dis *476 miss the bill of complaint. The chancellor’s reasoning was:
“[T]hat this Court feels that under the law of merger, that in the absence of mistake or fraud there was in fact a merger, and the only instrument capable of and actually conveying any rights was the assignment of December 11, 1959. The Court feels that the intent of the parties as shown by their actions clearly justifies the Court in finding that both of the parties did in fact not intend for all the conditions of the farm-out letter to be in full force and effect. And since the assignment in no way mentions extensions or renewals, the Court feels that there can be and is no equity shown on the face of the Bill.”
The farm-out letter of December 10, 1959, recites:
“Mr. J. E. Stack
P. O. Box 1023
Meridian, Mississippi
Dear Sir:
“This letter is written for the purpose of evidencing and confirming an agreement between you and Phillips Petroleum Company, as follows, to-wit:
“Phillips Petroleum Company now owns certain valid and subsisting oil and gas leases covering all of Section 9, less and except the W/2 NW/4 and Northwest 11 acres out of the SE/4 NW/4; all of Section 10, less and except the S/2 SE/4 NE/4; S/2 and SW/4 NW/4 and N/2 SE/4 NW/4 of Section 11;' N/2 NE/4 Section 15, all in Township 2 North, Range 16 East, Clarke County, Mississippi.
“Phillips Petroleum Company is desirous of having said leases tested for oil and/or gas. Now, therefore, in consideration of the mutual advantages to J. E. Stack and Phillips Petroleum Company, such parties agree as follows:
“J. E. Stack will on or before January 31, 1960, commence actual drilling of a 4100 foot Eutaw wildcat exploratory well to be drilled in the S/2 of Section 11-2N-16E, Clarke County, Mississippi, and drill a second well to the stratigraphic equivalent depth of first well or production at a lesser depth, within ninety (90) days after completion of first well, at a location on the assigned acreage. In consideration of J. E. Stack drilling said wells, Phillips Petroleum Company, upon receipt of an executed copy of this letter, will assign J. B. Stack, without representation or warranty of title, either expressed or implied, their oil and gas leasehold interest on the above described land retaining unto themselves a % of Vs ORRI on all production from gas wells and % of % ORRI on all production of 30 barrels or more of oil per day per well and/or He of % ORRI on all production of less than 30 barrels of oil per day per well attributable to the interest assigned, calculated on a calendar month basis.
“All interests, reservations and rights of Phillips in and to the lands above described and the production therefrom provided for in this agreement shall extend not only to the oil and gas lease (or leases) to be assigned, but also to any and all extensions or renewals of said oil and gas lease (or leases) which may be acquired by I. B. Stack. The term ‘extensions’ of the aforesaid oil and gas lease (or leases) as used herein shall be deemed to include, but not by way of limitation, any agreement or agreements of whatsoever character acquired by J. E. Stack or his assigns under and by virtue of which said oil and gas lease (or leases) is continued in force. The term ‘renewals’ of the aforesaid oil and gas lease (or leases) as used herein shall be deemed to include, but not. by way of limitation, any lease or leases acquired by J. E. Stack or his assigns on all or any part of the lands above described within twelve (12) months from the date of termination or expiration of said lease (or leases) or any extensions or renewals *477 thereof. J. B. Stack agrees to execute such further grants and assurances■ as may be requisite to vest in Phillips under any such extensions or renewals the same rights and interest in and to the lands above described and the production therefrom as are reserved by or granted to. Phillips under the provisions of this agreement.
“J. E. Stack further agrees that he will reimburse Phillips Petroleum Company for all delay rentals paid on his behalf after November 1, 1959, and that after the aforementioned assignment has been made, you will make all future delay rental payments. If, after completion of the two above mentioned wells, J. E. Stack does not desire to keep the subject oil and gas leases in force and effect by payment of delay rentals, he shall then so notify Phillips in writing at least thirty (30) days prior to the rental payment date given in such lease or leases. Phillips shall have fifteen (15) days after receipt thereof within which to elect to receive a re-assignment of said lease. If Phillips elects not to accept a re-assignment within said time, J. E. Stack agrees to promptly release of record the affected lease or leases insofar as they cover the assigned acreage.
“On all wells drilled on the assigned acreage, representatives of this Company shall be given access to the derrick floor and shall be given all information regarding cuttings, cores, drilling depths and other information which they may desire and upon completion of any such well you shall furnish us with copies of all logs made in connection with the drilling thereof, which shall include drillers’ logs, all electrical logs and any other logs containing information desired by this Company.
“Unless this agreement is accepted by you and two copies thereof returned to the undersigned at the above address within ten (10) days from the above date, then and thereupon the agreement, at our option, shall be null and void. (Emphasis added).
Very truly yours,
PHILLIPS PETROLEUM COMPANY
By s/H. J. Tyler H. J. Tyler Division Manager
HJT:LGT:vw
Accepted This 15th D.ay of December 1959.
s/J. E. Stack”
The assignment of oil and gas leases of December 11, 1959, is as follows:
“ASSIGNMENT OF OIL AND GAS LEASES
“THIS ASSIGNMENT, made and entered into this 11th day of December 1959, by and between PHILLIPS PETROLEUM COMPANY, a Delaware corporation with an operating office at Bartlesville, Oklahoma, hereinafter referred to as ‘Assignor’, and J. E. STACK, Meridian, Mississippi, hereinafter referred to as ‘Assignee’,
WITNESSETH:
“THAT, Assignor is the owner of certain oil and gas leases covering certain. lands in Clarke County, Mississippi, which oil and gas leases are briefly described in Exhibit ‘A’ attached hereto and by this reference made a part hereof, and to which oil and gas leases and to the record thereof reference is here made for all of the terms and covenants thereof.
“THAT, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, receipt of which is hereby acknowledged, Assignor does hereby assign and transfer unto Assignee all of its right, title and interest in and to the oil and gas leases described in Exhibit ‘A’ insofar as said oil and gas leases cover and pertain *478 to the oil, gas and casinghead gas, and all rights pertaining thereto, in the lands specifically described in Exhibit ‘A’, hereinafter referred to as the ‘assigned premises’. This assignment is made subject to the conditions, covenants, reservations and exceptions hereinafter set forth and subject to all valid and existing production payments, overriding royalties or other encumbrances with which said leases may be burdened.
“Assignor excepts from the within assignment and reserves and retains unto itself, its successors and assigns, as an overriding royalty:
“(a) One-eighth (]/s) of seven-eighths (%) of all oil produced and saved from the assigned premises during each calendar month in which the daily average production of oil per well is 30 barrels or more.
“(b) One-sixteenth (We) of seven-eights (%) of all oil produced and saved from the assigned premises during each calendar month in which the daily average production of oil per well is less than 30 barrels.
“(c) One-eighth (i/s) of seven-eighths (7/%) of all gas and casinghead gas produced and saved from the assigned premises.
“The daily average production of oil per well per calendar month, as herein above mentioned, shall be determined by dividing the total number of barrels of oil produced from all wells on the assigned premises during said calendar month by the aggregate number of days during which such wells produced oil in said calendar month.
“Said overriding royalty shall be delivered to Assignor in the pipe line to which the well or wells on said premises may be connected free and clear of all risks incident to and all expense of drilling, testing, developing, operating and maintaining said premises and said oil and gas leases, and free and clear of all taxes, except that said overriding royalty interest shall bear its proportionate part of gross production, severance and/or ad valorem taxes. The proceeds of said overriding royalty interest shall be paid monthly direct to Assignor at its office in Bartlesville, Oklahoma, by the purchaser or purchasers of said production.
“In the event the leases described in Exhibit ‘A’ cover less than the entire mineral interest in any portion or portions of the lands covered thereby, then as to such portion or portions, the overriding royalty retained by Assignor shall be reduced proportionately.
“As between Assignor and Assignee, Assignee shall have the right to pool and combine the lands covered by the oil and gas leases described in Exhibit ‘A’ with other lands in accordance with the terms and provisions of said oil and gas leases and in the event of such pooling Assignor shall receive as an overriding royalty on the production from any such pooled unit that proportion of the overriding royalty herein retained by Assignor as the number of acres covered by the lease or leases described in Exhibit ‘A’ included in any such pooled unit bears to the total number of acres included in such pooled unit.
“This assignment is made without warranty of title, either express or implied.
“EXECUTED AND DELIVERED the day and year first above written.”
The assignment was signed and acknowledged by Phillips Petroleum Company and J. E. Stack.
On December 3, 1959, Stack had wired Phillips:
“We agree to reimburse Phillips Petroleum for lease rental money advanced during December 1959 and January & February 1960 on deal in 2N-16W Clarke County, Mississippi provided we receive letter of agreement within next 15 days.” (Emphasis added).
*479 The farm-out letter of December 10, 1959, was sent-to Stack within fifteen days and was accepted by him on December 15, 1959. The Shreveport Division Office of Phillips had carried on the negotiations with Stack, and when the terms of the contract had been agreed on, prepared the farm-out letter of December 10, 1959, and forwarded it to the home office at Bartles-ville, Oklahoma, for its approval.
The Bartlesville office prepared the assignment of oil and gas leases referred to in unnumbered paragraph four of the farm-out letter, executed two copies of the assignment, and forwarded these two copies to the Shreveport office with specific instructions not to send on to Stack the executed assignment until the Shreveport office had in hand a copy of the farm-out letter executed by Stack.
This was in accord with the following provision of the farm-out letter:
“ * * * Phillips Petroleum Company, upon receipt of an executed copy of this letter, will assign J. E. Stack * * *.”
Lloyd G. Tankersley of the Shreveport Division Office of Phillips wrote Stack on December 16, 1959:
“Re: Farmout — J. E. Stack
Quitman Area
Clarke County, Mississippi
“Mr. J. E. Stack
P. O. Box 1023
Meridian, Mississippi
Dear Sir:
“This is to acknowledge receipt of that certain letter dated December 10, 1959, which you executed December 15, 1959. We are returning one copy of said letter for your file and are also enclosing two copies of an assignment of oil and gas leases covering the above captioned deal. Please return one executed and acknowledged copy of said assignment to this office for our file.”
On December 21, 1959, Tankersley of the Shreveport office wrote the Bartlesville office:
Re: G.F. #11602 - J.E. Stack F/O
Quitman Area
Clarke County, Mississippi,
“Mr. R. C. Curtiss
Bartlesville Office
“In accordance with your letter of December 11, 1959, we enclose herewith one fully executed copy of the subject assignment.
“We also enclose two executed copies of our letter agreement dated December 10, 1959, which was accepted by Mr. J. E. Stack under the date of December 15, 1959.”
Stack proceeded to drill the two test wells and reimbursed Phillips for all delay rentals paid on his behalf after November 1, 1959, all in strict compliance with the requirements of the December 10, 1959, farm-out letter.
Broadhead and Stack acquired other farm-outs and other assignments of oil and gas leases from Phillips. On January 2, 1962, they wrote Phillips:
“Dear Mr. Tyler:
“We have been going over the lease situation in the Quitman area of Clarke County, Mississippi, which we acquired from you people on various farmouts. A great number of these leases have expired under their own terms.
“We have drilled two 4000' test, one 9000', and one 7000' on acreage acquired from you and have obtained two small producers, Longbell 1 and 2 with a daily total production of 22 BBls.
“We have been considering what to do with the area as to future developments and have come to the conclusion that if you people would be willing to reduce your overriding royalty reservation to a straight Jieth of %th that we will attempt *480 to buy renewals on all expirations and attempt some further drilling. As you probably know, Texaco has come into Section 8 and 9 of 2-16 and paid $35.00 per acre. So this has set what we consider excessively high price on the area considering the results to date.
“Time is of the essence if we are to accomplish this project. We have already been making personal contact with the mineral owners locally and ask them to give us time to contact you people to see what your disposition of the matter will be.
“Yours truly,
BROADHEAD AND STACK
By s/J. E. Stack, Jr. J. E. Stack, Jr.”
On March 30, 1967, Phillips, acting through Lloyd Tankersley, approached Stack with reference to executing assignments of overriding royalty interests on extensions and renewal leases which Stack had acquired from some of the original lessors. This was in accordance with the following provision of the December 10, 1959, farm-out letter:
“J. E. Stack agrees to execute such further grants and assurances as may be requisite to vest in Phillips under any such extensions or renewals the same rights and interest in and to the lands above described and the production therefrom as are reserved by or granted to Phillips under the provisions of this agreement.”
Stack refused to execute these assignments, and Phillips brought this suit praying for specific performance of the provision of the farm-out letter of December 10, 1959, providing for the execution by Stack of necessary instruments conveying overriding royalty interests in all extensions and renewal leases as these terms are defined in the farm-out letter.
Frances Margaret Stack, wife of J. E. Stack, was made a defendant because. certain of the alleged extension and renewal leases were taken in her name. A. F. Chisholm was made a party defendant because an interest in some of the alleged extension and renewal leases was assigned to him by Stack and wife. A deed of trust, and amendments thereto, were executed by Stack and wife, to W. Calvin Wells, Trustee for Whitney National Bank of New Orleans, Beneficiary, conveying in trust their interest in the extension and renewal leases described in Exhibit “B” to the bill of complaint, so Wells and Whitney National Bank were made parties defendant. However, it was stipulated that Wells, Trustee, and Whitney National Bank were bona fide encumbrancers for value without notice so the lien of the deed of trust and amendments thereto, is not affected in any way by this lawsuit. Mrs. Stack and A. F. Chisholm had actual notice of the farm-out letter of December 10, 1959, so the decision of this lawsuit will affect and determine their interests.
Stack testified that his agreement was to drill two wells and that he had done that; he admitted that this was the quid pro quo for the assignment. The only place he committed himself to do this was in the farm-out letter of December 10, 1959. The assignment merely states the consideration to be “Ten Dollars ($10.00) and other good and valuable consideration, receipt of which is hereby acknowledged.” Nowhere in the assignment is there an agreement to reimburse Phillips for all delay rentals paid after November 1, 1959, yet Stack did this. Again, he was following through on another specific requirement of the farm-out letter.
The truth of the matter is that at the time the assignment was executed on December 11,1959, no part of the consideration had been paid or performed by Stack; at that time it was purely and simply an executory contract. If, as contended by the appellees, the assignment only should be looked to for the terms of the agreement, then on its face, there was a completed gift of 192 leases to Stack, because receipt was *481 acknowledged of the entire consideration. Stack himself admits that this was not the case. He admits that he was obligated to drill two test wells and yet the only instrument obligating him so to do was the farm-out letter of December 10, 1959.
He cannot pick and choose among the terms of the farm-out letter. It is either a part of the contract between the parties or it is not. If it is a part of the contract, then all of its terms must be complied with.
We think the intent of the parties, as demonstrated by their actions, was that the farm-out letter of December 10, 1959, and the assignment of December 11, 1959, together constituted the contract and agreement between the parties. The farm-out letter was not merged into nor superseded by the assignment.
The Supreme Court of Oklahoma was confronted with a similar situation in Doss Oil Royalty Co. v. Lahman, 302 P.2d 157 (Okl.1956), and reached the same conclusion that we now reach. In that case, they said:
“The first proposition with which we are confronted is whether the instruments of December 3 and 5, 1923, are to be taken together as parts of one written contract or whether the instrument of December 3 was merged in, and superseded by, the instrument of December 5, and the latter was the entire agreement finally reached between the parties. An examination of the two instruments discloses that the December 5 instrument was executed to carry out the intent of the other and only in the instrument of December 3 is mention made of the re-conveyance from Doss to plaintiff which constituted another of the vital elements of the agreements. Under such circumstances, it was not necessary for that instrument to be specifically incorporated in the writing of December 5, in order to be a part of the contract. In the case of Banks v. City of Ardmore, 188 Okl. 611, 112 P.2d 372, it was held that,
Where a contract and deed, although executed and delivered at different times, constitute parts of the same transaction, and the delivery of the deed is only a part performance of the terms of the contract, and is not intended to supersede the contract, the contract is not merged in the deed hut both are to he construed together.’

"Viewing these instruments in the light of ordinary experience, it is readily apparent that the December 3 writing constituted the agreement of the parties and the execution and delivery of the December 5 writing was for the purpose of complying with one of the provisions of that agreement. * * *" 302 P.2d at 161. (Emphasis added).
To the same effect was Rocks v. Brosius, 241 Md. 612, 217 A.2d 531 (1966), wherein the Court of Appeals of Maryland said:
“The trial court, in our opinion, properly construed all the documents together as part of a single transaction constituting one contract for the subdivision and development of the Briar-wood tract. A contract need not be evidenced by a single instrument. Where several instruments are made a part of a single transaction they will all be read and construed together as evidencing the intention of the parties in regard to the single transaction. This is true even though the instruments were executed at different times and do not in terms refer to each other. * * *” 241 Md. at 637, 217 A.2d at 545. (Emphasis added).
In Gilchrist Tractor Co. v. Stribling, 192 So.2d 409 (Miss.1966), the parties entered into a written agreement dated May 23, 1962, and styled “Contract for Purchase and Sale of Corporate Stock”. This agreement covered the basic aspects of the transaction and enumerated certain specific areas to be covered more in detail on a later date by further written contracts, the parties agreeing to work toward a final closing date of June 1, 1962. Pursuant to *482 the original contract of May 23, 1962, six supplemental contracts were prepared and executed by the parties as of June 1, 1962. These were the contracts expressly contemplated under the terms of the original agreement of May 23rd.
In holding that all of these instruments were part and parcel of only one contract between the parties, this Court said:
“They dealt with the same subject matter and the contracting parties were the same. Under the circumstances here, each document is a component part of the contract covering the over-all agreement, and all must be considered together in order to determine the intention of the parties as finally arrived at. * * *" 192 So.2d at 417. (Emphasis added).
The Court then quoted with approval the general rule found in 17 Am.Jur.2d Contracts Section 264 (1964):
“ ‘The general rule is that in the absence of anything ■ to indicate a contrary intention, instruments executed at the same time, by the same contracting parties, for the same purpose, and in the course of the same transaction will be considered and construed together, since they are, in the eyes of the law, one contract or instrument. * * * Id. at 668.
“ ‘Construing contemporaneous instruments together means simply that if there are any provisions in one instrument limiting, explaining, or otherwise affecting the provisions of another, they will be given effect as between the parties themselves and all persons charged with notice so that the intent of the parties may be carried out and the whole agreement actually made may be effectuated. * * * Id. at 670.
“ ‘Where the terms employed to express some particular condition of a contract are ambiguous .and cannot be satisfactorily explained by reference to other parts of the contract and the parties have made other contracts in respect of the same subject matter, apparently in pursuance of the same general purpose, it is always permissible to examine all of them together in aid of the interpretation of the particular condition; and if it is found that the ambiguous terms have a plain meaning by a comparison of the several contracts and an examination of their provisions, that meaning should be attributed to them in the particular condition.’ Id. at 671.” 192 So.2d at 417-418. (Emphasis added).
In Gilchrist the Court also quoted the rule found in Restatement, Contracts Section 235 at page 319 (1932):
“ ‘ * * * all writings forming part of the same transaction are interpreted together.’ ” 192 So.2d at 418.
The chancellor erroneously concluded that the farm-out letter of December 10, 1959, was merged into and superseded by the assignment of. December 11, 1959. These two instruments together constituted the contract between the parties. The judgment dismissing the amended bill of complaint is reversed and this cause remanded for further proceedings not inconsistent with this opinion.
Reversed and remanded.
RODGERS, JONES, BRADY and INZER, JJ., concur.